UNITED STATES of America

v.

**KUN YUN JHO and OVERSEAS SHIPHOLDING GROUP, INC.**

**No. CR.A.106CR65TH(ALL).**

United States District Court,
E.D. Texas,
Beaumont Division.

Dec. 4, 2006.

John Malcolm Bales, US Attorney's Office, Lufkin, TX, Joseph Robert Batte, US Attorney's Office, Beaumont, TX, for United States of America.

Kun Yun Jho, Houston, TX, pro se.

Robert Jon Sussman, Hinton Sussman Bailey & Davidson, Houston, TX, Thomas Nave Kiehnhoff, Reaud Morgan & Quinn LLP, Beaumont, TX, for Kun Yun Jho and Overseas Shipholding Group, Inc.

### MEMORANDUM OPINION AND ORDER ADOPTING REPORTS AND RECOMMENDATIONS AS MODIFIED HEREIN AND PARTIALLY GRANTING DEFENDANTS' MOTIONS TO DISMISS

HEARTFIELD, District Judge.

Before the Court is a *Report and Recommendation on Defendant Jho's Motions to Dismiss* [Clerk's Docket No. 108] and a *Report and Recommendation on Defendant Overseas Shipholding Group, Inc.'s Motion to Dismiss* [Clerk's Docket No. 109], both of which were filed on November 13, 2006. Defendants filed objections [Clerk's Docket Nos. 100, 117] to the reports and recommendations, to which the government did not respond. The Court heard argument on the objections on two separate occasions. Having considered the foregoing, the Court enters this memorandum opinion and order adopting the reports and recommendations as modified herein and partially granting defendants' motions to dismiss [Clerk's Docket Nos. 18, 59 and 63].

## I. MODIFICATIONS

The reports and recommendations are modified so as to grant defendants' motions to dismiss Counts 3 through 10 criminally charging defendants with violations of 33 C.F.R. § 151.25 and that portion of Count 1 alleging that defendants conspired to violate 33 C.F.R. § 151.25. *See Second Superceding Indictment* [Clerk's Docket No. 46].

In Counts 3–10, the government charges that:

[Jho and OSG] did knowingly fail to maintain an Oil Record Book for the *Pacific Ruby* in which all disposals of oil

residue and discharges overboard and disposals otherwise of oily mixtures, slops from bilges and bilge water that accumulated in machinery spaces were fully recorded. Specifically, on each date Defendant Jho failed to maintain an accurate Oil Record Book, by failing to disclose exceptional discharges in which overboard discharges of oily mixtures, slops from bilges and bilge water that accumulated in machinery spaces had been made without the use of properly functioning Oil Water Separator and Oil Content Meter and falsely indicating the proper use of required pollution prevention equipment....

*Second Superceding Indictment* at ¶ 22 [Clerk's Docket No. 46]. In Count 1, the government charges that defendants violated 18 U.S.C. § 371 when they allegedly conspired:

> To knowingly fail to maintain an Oil Record Book for the *Pacific Ruby* in which did [*sic* ] knowingly fail to maintain an Oil Record Book for the *Pacific Ruby* in which all disposals of oil residue and discharges overboard and disposals otherwise of oily mixtures, slops from bilges and bilge water that accumulated in machinery spaces were fully recorded, in violation of Title 33 United States Code, section 1908(a) and Title 33, Code of Federal Regulation, sections 151.25(a) and 151.25(h).

The charges alleged in Counts 3 through 10 of the *Second Superceding Indictment* are brought pursuant to the enforcement provision of the ACT TO PREVENT POLLUTION FROM SHIPS (APPS), codified at 33 U.S.C. § 1901 *et seq.* APPS in the federal law implementing two related international treaties[1] regulating pollution discharges from ships to which the United States is a signatory nation. *See United States v. Abrogar*, 459 F.3d 430, 431–32 (3d Cir. 2006).

APPS authorizes the U.S. Coast Guard to issue regulations implementing procedures, standards and rules commensurate with the MARPOL Protocol. 33 U.S.C. § 1903; 33 C.F.R. § 151.01 *et seq.* The substantive regulation defendants are charged with violating essentially incorporates MARPOL's oil record book requirements into federal law. 33 C.F.R. § 151.25. *See Second Superceding Indictment* at ¶ 22 [Clerk's Docket No. 46]. Entitled "Oil Record Book", this regulation requires that:

> (a) EACH OIL TANKER OF 150 GROSS TONS AND ABOVE, SHIP OF 400 GROSS TONS AND ABOVE OTHER THAN AN OIL TANKER, AND MANNED FIXED OR FLOATING DRILLING RIG OR OTHER PLATFORM SHALL MAINTAIN AN OIL RECORD BOOK PART I (MACHINERY SPACE OPERATIONS). AN OIL TANKER OF 150 GROSS TONS AND ABOVE OR A NON OIL TANKER THAT CARRIES 200 CUBIC METERS OR MORE OF OIL IN BULK, SHALL ALSO MAINTAIN AN OIL RECORD BOOK PART II (CARGO/BALLAST OPERATIONS).

> \* \* \* \* \* \*

> (d) ENTRIES SHALL BE MADE IN THE OIL RECORD BOOK ON EACH OCCASION, ON A TANK TO TANK BASIS IF APPROPRIATE, WHENEVER ANY OF THE FOLLOWING MACHINERY SPACE OPERATIONS TAKE PLACE ON ANY SHIP TO WHICH THIS SECTION APPLIES—

> > (1) BALLASTING OR CLEANING OF FUEL OIL TANKS;

---

**1.** Collectively referred to as the MARPOL Protocol, the two treaties APPS codifies are the 1973 INTERNATIONAL CONVENTION FOR THE PREVENTION OF POLLUTION FROM SHIPS AND THE PROTOCOL OF 1978 RELATING TO THE INTERNATIONAL CONVENTION FOR THE PREVENTION OF POLLUTION FROM SHIPS. These treaties were negotiated by member nations of the International Maritime Organization (IMO), a mutilateral body formed in 1948.

(2) DISCHARGE OF BALLAST CONTAINING AN OILY MIXTURE OR CLEANING WATER FROM FUEL OIL TANKS;

(3) DISPOSAL OF OIL RESIDUE; AND

(4) DISCHARGE OVERBOARD OR DISPOSAL OTHERWISE OF BILGE WATER THAT HAS ACCUMULATED IN MACHINERY SPACES.

\* \* \* \* \* \*

(h) EACH OPERATION DESCRIBED IN [PARAGRAPHS (D) ]OF THIS SECTION SHALL BE FULLY RECORDED WITHOUT DELAY IN THE OIL RECORD BOOK SO THAT ALL THE ENTRIES IN THE BOOK APPROPRIATE TO THAT OPERATION ARE COMPLETED. EACH COMPLETED OPERATION SHALL BE SIGNED BY THE PERSON OR PERSONS IN CHARGE OF THE OPERATIONS CONCERNED AND EACH COMPLETED PAGE SHALL BE SIGNED BY THE MASTER OR OTHER PERSON HAVING CHARGE OF THE SHIP.

\* \* \* \* \* \*

(j) THE MASTER OR OTHER PERSON HAVING CHARGE OF A SHIP REQUIRED TO KEEP AN OIL RECORD BOOK SHALL BE RESPONSIBLE FOR THE MAINTENANCE OF SUCH RECORD.[2]

33 C.F.R. § 151.25.

Violation of the MARPOL Protocol, APPS, or the Coast Guard regulations issued thereunder is made unlawful by APPS. 33 U.S.C. § 1907(a). While it is true that the enforcement provision found in APPS contemplates both criminal and civil penalties, the scope of enforcement practices is not as broad as that provision reads on its face. 33 U.S.C. § 1908. This is because section 1908 must be read in light of section 1912, which provides that "any action taken under [Chapter 33] shall be taken in accordance with international law." 33 U.S.C. § 1912. In this way, the civil and criminal enforcement scheme created by APPS integrates and is circum-

scribed by principles of customary international law.

The UNITED NATIONS CONVENTION ON THE LAW OF THE SEA (UNCLOS) is a codification of customary international law negotiated under the auspices of a United Nations conference. THIRD UNITED NATIONS CONFERENCE ON THE LAW OF THE SEA, 21 I.L.M. 1245 (1982); *Sarei v. Rio Tinto*, 456 F.3d 1069 (9th Cir.2006) (*citing United States v. Alaska*, 503 U.S. 569, 588 n. 10, 112 S.Ct. 1606, 118 L.Ed.2d 222 ("The United States ... has recognized that [the UNCLOS's] baseline provisions reflect customary international law"); *see also* LORI F. DAMROSCH ET AL., *International Law: Cases and Materials* (4th ed.2001)(most provisions of the UNCLOS "are clearly established customary law of the sea").

■ Although UNCLOS has been signed by the President and forwarded to the Senate, it has not yet been ratified. It is nevertheless appropriate for this Court to consider UNCLOS jurisdictional provisions as they relate to the prosecutions at bar. *Lauritzen v. Larsen*, 345 U.S. 571, 582, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) (courts generally defer to international maritime laws of "impressive maturity and universality"); *see also United States v. Royal Caribbean Cruises*, 24 F.Supp.2d 155, 159 (D.P.R.1997). "The submission of the treaty to the Senate expresses to the international community the United States' ultimate intention to be bound by the pact." *Id.* Pending a treaty's ratification by the Senate, "the United States is bound to uphold the purpose and principles of the agreement." *Id.* Conversely, "a state that has signed the agreement or expressed its consent to be bound is

---

**2.** Although it is not necessary for the Court to reach this point, it is worth noting that Captain Jho—as the chief engineer but not the master of the *Pacific Ruby*—is not even the person required by the Coast Guard regulations to maintain the oil record book. 33 C.F.R. § 151.25(j).

obliged to refrain from acts that would defeat the object and purpose of the agreement." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 312(3).

■ UNCLOS contains very specific and authoritative rules regarding jurisdiction to enforce marine pollution. UNCLOS specifically confers jurisdiction over marine pollution in article 216, which provides:

> LAWS AND REGULATIONS ADOPTED IN ACCORDANCE WITH THIS CONVENTION AND APPLICABLE INTERNATIONAL RULES AND STANDARDS ESTABLISHED THROUGH COMPETENT INTERNATIONAL ORGANIZATIONS OR DIPLOMATIC CONFERENCE FOR THE PREVENTION, REDUCTION AND CONTROL OF POLLUTION OF THE MARINE ENVIRONMENT BY DUMPING SHALL BE ENFORCED:
>
> (a) BY THE COASTAL STATE WITH REGARD TO DUMPING WITHIN ITS TERRITORIAL SEA OR ITS EXCLUSIVE ECONOMIC ZONE OR ONTO ITS CONTINENTAL SHELF;
>
> (b) BY THE FLAG STATE WITH REGARD TO VESSELS FLYING ITS FLAG OR VESSELS OR AIRCRAFT OF ITS REGISTRY . . . .

THIRD UNITED NATIONS CONFERENCE ON THE LAW OF THE SEA, 21 I.L.M. 1245, 1311 (1982). This provision is a codification of the long-standing international maritime rule known as "the law of the flag." Under this jurisdictional principle, a ship is considered part of the territory of the sovereignty whose flag it flies, and the ship does not lose that character when in the territorial limits of another sovereignty. *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). The flag state is responsible for ensuring that vessels flying its flag comply with international rules. For this reason, the flag state has primary responsibility for the enforcement of marine pollution laws.

The law of the flag principle recognizes the right of non-flag states to seek redress for marine pollution in limited circumstances. Under UNCLOS, the coastal state has jurisdiction to enforce international pollution rules when the foreign vessel dumps pollution within the coastal state's territorial sea, exclusive economic zone or continental shelf. THIRD UNITED NATIONS CONFERENCE ON THE LAW OF THE SEA ART. 16, 21 I.L.M. 1245, 1311 (1982). Moreover, the international scheme established by UNCLOS contemplates the levying of civil fines by non-flag states. Regarding penalties for violations of marine pollution laws, article 230(2) of UNCLOS provides as follows:

> *MONETARY PENALTIES ONLY MAY BE IMPOSED WITH RESPECT TO VIOLATIONS OF NATIONAL LAWS AND REGULATIONS OR APPLICABLE INTERNATIONAL RULES AND STANDARDS FOR THE PREVENTION, REDUCTION AND CONTROL OF POLLUTION OF THE MARINE ENVIRONMENT, COMMITTED BY FOREIGN VESSELS IN THE TERRITORIAL SEA, EXCEPT IN THE CASE OF A WILFUL AND SERIOUS ACT OF POLLUTION IN THE TERRITORIAL SEA.*

THIRD UNITED NATIONS CONFERENCE ON THE LAW OF THE SEA, 21 I.L.M. 1245, 1315 (1982)(emphasis added).

■ The Court is of the opinion that long-standing principles of international law made specifically applicable to APPS by section 1912 require dismissal of the criminal charges alleging violation of the Coast Guard regulations. Here, the United States government is seeking to criminally prosecute a foreign flag ship for alleged violations of U.S. Coast Guard regulations that occurred aboard ship and outside U.S. waters. 33 C.F.R. § 151.25. Because the government has not charged defendants with an act of pollution in U.S. waters, the government may only pursue civil penalties for violations of Coast Guard regulations by foreign-flag ship personnel that occurred aboard the *Pacific Ruby*. UNCLOS art. 230(2). Maintenance of a criminal prosecution on

these facts runs afoul of well-established law of the flag principles which seek to ensure uniformity, comity and reciprocity among sea-faring nations. It is for this reason that Counts 3 through 10 alleging violation of 33 C.F.R. § 151.25 and the portion of Count 1 alleging that defendants conspired to violate 33 C.F.R. § 151.25 must be dismissed.

## II. ORDER

**IT IS THEREFORE ORDERED** that the *Report and Recommendation on Defendant Jho's Motions to Dismiss* [Clerk's Docket No. 108] and the *Report and Recommendation on Defendant Overseas Shipholding Group, Inc.'s Motion to Dismiss* [Clerk's Docket No. 109] are hereby **ADOPTED AS MODIFIED HEREIN.**

**IT IS FURTHER ORDERED** that the defendants' motions to dismiss [Clerk's Docket Nos. 18, 59 and 63] are hereby **GRANTED** to the extent they seek dismissal of Counts 3 through 10 alleging violation of 33 C.F.R. § 151.25 and the portion of Count 1 alleging that defendants conspired to violate 33 C.F.R. § 151.25. *See Second Superceding Indictment* [Clerk's Docket No. 46].

**SO ORDERED.**

## REPORT AND RECOMMENDATION ON DEFENDANT JHO'S MOTIONS TO DISMISS

GIBLIN, United States Magistrate Judge.

Pursuant to 28 U.S.C. § 636(b) and the Local Rules for the United States District Court for the Eastern District of Texas, the District Court referred this criminal matter to the undersigned United States Magistrate for hearing and submission of findings of fact and a report and recom-

mendation on certain case-dispositive motions. *See Order of Referral* [Clerk's doc. # 70]. Pending before the Court for purposes of this report are *Defendant Jho's Motion to Dismiss* [Clerk's doc. # 18] and *Supplemental Motion to Dismiss* [Clerk's doc. # 63].

### Background [1]

Defendant Kun Yun Jho (hereinafter referred to as "Jho") was employed as the Chief Engineer of the *M/T Pacific Ruby*. The *M/T Pacific Ruby* is an ocean-going petroleum oil tanker owned and operated by Overseas Shipholding Group, Inc. (OSG), which is a New York corporation. The *Pacific Ruby* is registered in the Marshall Islands.

As Chief Engineer, Jho has the overall responsibility for the operations in the engine room of the *Pacific Ruby,* including the responsibility for operating the vessel's anti-pollution equipment and entering information concerning that equipment into a log book (Oil Record Book) which is regularly inspected by the United States Coast Guard. Engine room operations in large marine vessels such as the *Pacific Ruby* generate large quantities of oil-contaminated bilge waste when oil drips from the engine's fuel and lubrication systems and mixes with water in the bottom of the vessel. These "oily mixtures" are also referred to as "bilge slops" or "slops from bilges". The oily mixtures are collected and processed through an Oily Water Separator whereby the water is separated from the oil and other wastes. The mixture is then passed through an oil-sensing device known as an Oil Content Meter. If the Oil Content Meter determines that the oil content of the effluent exceeds fifteen parts per million (15 ppm), alarms sound,

---

**1.** The facts are taken from the *Second Superseding Indictment* [Clerk's doc. # 46] on file in this matter.

and the effluent is automatically directed to a storage tank on the vessel. If the Oil Content Meter determines that the oil content in the effluent is 15 ppm or less, the effluent is discharged overboard.

Apparently, the Oil Content Meter can be "tricked" into erroneously "believing" that the effluent contains 15 ppm or less oil by flushing it with fresh water to skew the oil content reading. Also, the system can apparently be "tricked" by inserting tools or other objects into valves or other pieces of equipment to cause an oily mixture containing oil of 15 ppm or more to be discharged overboard rather than be properly directed to the appropriate storage tank. In response to this, some vessels have "anti-tricking" devices installed to thwart "tricking" of the anti-pollution equipment.

a). *Charges Pending Against Jho Under the Second Superseding Indictment*

A federal grand jury returned a Second Superseding Indictment [Clerk's doc. # 46] against Jho and OSG on August 16, 2006. Count 1 of the Second Superseding Indictment charges that OSG and its employee and co-defendant Jho conspired to: (1) make false and use false writings in a matter within the jurisdiction of the U.S. Coast Guard and the Department of Homeland Security; (2) fail to maintain an Oil Record Book for the *Pacific Ruby;* and (3) alter, conceal, cover up, falsify, or make a false entry in a record or document with the intent to impede, obstruct, or influence the investigation and proper administration of a matter within the jurisdiction of the U.S. Coast Guard and Department of Homeland Security, all in violation of Title 18, United States Code, Section 371.

The "manner and means" portion of the Second Superseding Indictment sets forth allegations of how Jho, OSG, and others intended to effectuate the conspiracy and further its objectives. The Second Superseding Indictment alleged that the defendants routinely discharged oily mixtures into the ocean with equipment and procedures that prevented the Oil Content Meter from operating as it was designed. It alleges that the defendants taught other individuals to "trick" the Oil Content Meter by flushing it with fresh water to prevent it from sensing an actual sample of the overboard discharge. Jho allegedly taught other members of the conspiracy how to defeat newly installed anti-tricking equipment which would have prevented the use of fresh water to trick the Oil Content Meter. Finally, Jho and OSG also allegedly maintained a false and misleading Oil Record Book and made and caused to be made materially false statements to members of the United States Coast Guard while the *Pacific Ruby* was in port.

The Second Superseding Indictment also sets forth overt acts of the defendants which furthered the conspiracy. The Government alleges that Jho and OSG maintained a false and misleading Oil Record Book on sixteen (16) different occasions while at ports in the Eastern District of Texas. They allege that Jho directed individuals to search for objects to defeat the anti-tricking devices and directed a subordinate to flush the Oil Content Meter with fresh water while creating a record which concealed the tampering. The Government contends that OSG continued to operate the *Pacific Ruby* in United States ports without procedures and precautions to confirm the proper operation of the anti-tricking equipment after learning that the logging device was not properly recording dates. Finally, it is alleged that, on two occasions, Jho and OSG caused the presentation of a false Oil Record Book to members of the United States Coast

Guard which failed to record the discharges of oily mixtures.

Count 2 of the Second Superseding Indictment charges Jho and OSG with making false statements in violation of Title 18, United States Code, Sections 1001(a)(3) and 2. It alleges that Jho made and used a false and fictitious Oil Record Book that stated that a discharge had been made on September 11, 2005 "with 15 ppm equipped" which created the false impression, through false and misleading entries and omissions, that the vessel was operating properly when Jho knew that the Oil Content Meter was being flushed with fresh water and not sensing a true sample.

Counts 3 through 10 charge Jho and OSG with knowingly failing to maintain an Oil Record Book, by failing to disclose exceptional discharges in which oily mixtures, slops from bilges and bilge water that accumulated in machinery spaces had been made without the use of a properly functioning Oil Water Separator and Oil Content Meter and falsely indicating the proper use of required pollution prevention equipment on eight (8) different occasions, all in violation of Title 33, United States Code, Section 1908(a), Title 33 C.F.R., Section 151.25, and Title 18, United States Code, Section 2.

b.) *Applicable Laws and Treaties*

Before the Court are two key instruments setting forth the international legal and regulatory regime addressing the issues of marine pollution on the high seas. The first is the United Nations Convention on the Law of the Sea, 1982 (UNCLOS). The second includes the 1973 International Convention for the Prevention of Pollution from Ships and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships, collectively known as "MARPOL." *United States v. Abrogar*, 459 F.3d 430, 431–32 (3d Cir.2006); *see also* Shaun Gehan, Case Note, *United States v. Royal Caribbean Cruises, Ltd.: Use of Federal 'False Statements Act' to Extend Jurisdiction Over Polluting Incidents into Territorial Seas of Foreign States*, OCEAN & COASTAL L.J. 167, 169 (2002). UNCLOS has more the status of a "constitution of the oceans," whereas MARPOL sets out a detailed regulatory framework, specifically enforceable amongst the signatory states. Gehan, at 169. These treaties are not self-executing, but rather must be implemented by member states through legislation. *Id.* In the United States, Congress codified the provisions of MARPOL through the Act to Prevent Pollution from Ships (APPS), 33 U.S.C. §§ 1901, *et seq.* APPS make it a crime for any person to knowingly violate the MARPOL Protocol, APPS, or regulations promulgated under APPS. *See* 33 U.S.C. § 1908(a).

Regulations for the prevention of pollution by oil from ships are set forth in Annex I to MARPOL. APPS also authorizes the Coast Guard to issue regulations implementing the requirements of these treaties. 33 U.S.C. §§ 1903, 1907. The Coast Guard utilized this authority in issuing detailed regulations. *See* 33 C.F.R. §§ 151.01, *et. seq.* Annex I sets out the standards for the maximum amount of oil permitted to be discharged from ships. *See United States. v. Abrogar*, 459 F.3d 430, 431 (3rd Cir.2006). MARPOL also requires that ships have and maintain equipment to collect and measure the oil content of various waste and bilge discharges from ships and divert discharges which contain too much oil into storage tanks rather than discharging the liquid into the ocean. *Id.*

Vessels over a certain size (such as the *Pacific Ruby*) must maintain an Oil Record Book. 33 C.F.R. § 151.25(a). The Oil Record Book must contain entries which relate to the (1) transfer of oil; (2) man-

agement and disposal of oily wastes generated on board the vessel, including any discharges of dirty ballast or cleaning water from fuel oil tanks; and (3) the disposal of oily residue such as sludge, as well as discharges of bilge waste that has accumulated in machinery spaces. MARPOL Annex I, Reg. 20(1); *Abrogar*, 459 F.3d at 432. The Oil Record Book must also contain a record of emergency, accidental, or other exceptional discharges and the circumstances or reasons therefore. 33 C.F.R. 151.25(g). Certain entries in the Oil Record Book must be signed by the person in charge of the operation. 33 C.F.R. 151.25(h). Finally, under Title 33, United States Code, Section 1908(a), a person who knowingly violates the MARPOL Protocol, that chapter, or the regulations issued thereunder, commits a class D felony.

### Arguments Relating to The United Nations' Convention on the Law of the Sea (UNCLOS)

■ Jho initially argues that the United Nations' Convention on the Law of the Sea (UNCLOS) provides that a seaman cannot be prosecuted criminally in the United States for activities occurring on the ship except in the case of a willful and serious act of pollution in the territorial sea, citing Article 230.2 of UNCLOS. Jho contends that there is no allegation nor evidence that he committed a willful and serious act of pollution. Jho argues that the Government's use of the Oil Record Book as a basis for the criminal charges are a device to circumvent the treaty in that the alleged discharges are the crux of the case and the alleged discharges are not "willful and ser-

ious acts of pollution" as to subject Jho to incarceration.

The Government answers that the United States is not a party to UNCLOS. The Government further argues that even if the United States were a party to UNCLOS, Article 230 does not constrain or limit a prosecution for crimes committed in port.[2] Finally, the Government contends that Jho lacks standing to assert protection from UNCLOS.

Section 7 of part XII of the Law of the Sea Convention states:

Monetary penalties only may be imposed with respect to violations of national laws and regulations or applicable international rules and standards for the prevention, reduction and control of pollution of the marine environment, committed by foreign vessels in territorial sea, except in the case of a willful and serious act of pollution in the territorial sea.

*Law of the Sea Convention*, Article 230.2. In resolving these issues, this Court looks to the analysis and reasoning set forth by the district courts in *United States v. Royal Caribbean Cruises, Ltd.*, 24 F.Supp.2d 155 (D.P.R.1997) and *United States v. Royal Caribbean Cruises, Ltd.*, 11 F.Supp.2d 1358 (S.D.Fla.1998).

On October 25, 1994, the United States Coast Guard personnel observed the cruise ship *Sovereign of the Seas* discharging pollutants into the U.S. territorial sea off the coast of Puerto Rico.[3] *United States v. Royal Caribbean Cruises, Ltd.*, 24 F.Supp.2d 155, 158 (D.P.R.1997). When the ship reached port in San Juan, the

**2.** The Government points out that each count of the Second Superseding Indictment alleges a crime which occurred within the Eastern District of Texas and Jho has cited no authority for the proposition which supports dismissal for the alleged crimes of conspiracy, making false statements, or failing to maintain an

Oil Record Book while in a United States port.

**3.** Royal Caribbean Cruises, Ltd. (RCCL) owned and operated the *Sovereign of the Seas* and the ship flies the flag of Norway.

Coast Guard boarded the vessel and examined the ship's Oil Record Book. *Id.* At the conclusion of the resulting investigation, a federal grand jury returned a ten count indictment against Royal Caribbean Cruises, Ltd. (RCCL) and two members of the ship's crew.[4] *Id.* RCCL moved to dismiss counts one through six. RCCL maintained, and the district court agreed, that counts one through six, for the purposes of determining jurisdiction, rely on a single discharge of oil from the cruise ship in territorial waters. *Id.* at 159. RCCL, like Jho in this case, made the argument that the United Nations Law of the Sea Convention of 1982 (UNCLOS) applied and the Government was limited to the imposition of monetary penalties for violations of its pollution control laws involving non-serious discharges of pollutants within the territorial sea of the United States. *Id.* The district court noted that although the treaty was currently pending ratification by the Senate, it nevertheless carried the weight of law from the date of its submission by the President to the Senate. *Id.* (Citing Article 19 of the Vienna Convention on the Law of Treaties).

Finding UNCLOS to be applicable and finding no serious act of pollution, the district court held that RCCL and the crew members could only be subjected to monetary penalties within the jurisdiction of the United States pursuant to Article 230.2. *Id.* at 160. However, the court denied RCCL's motion to dismiss, holding that the limitation of monetary penalties does not bar the United States from pursuing Counts One through Six. The district court held that "[a]lthough the Government may be estopped from seeking non-monetary penalties, such as imprisonment, the pursuit of monetary penalties in no way contravenes international law." *Id.*

RCCL once again tested the applicability of UNCLOS, this time in a federal district court in Miami. *See United States v. Royal Caribbean Cruises, Ltd.,* 11 F.Supp.2d 1358 (S.D.Fla.1998). The facts of the Miami case were also fairly straightforward. On February 1, 1993, Coast Guard officials observed RCCL's cruise ship, the *Nordic Empress,* discharging oil from the ship in Bahamian waters. *Id.* at 1361. Coast Guard officials reviewed the ship's Oil Record Book when the ship reached Miami and noticed that there was no entry indicating that discharge. *Id.* RCCL was subsequently indicted for making a false statement "in the port of Miami,

---

4. Count One of the indictment charged RCCL and a crew member with conspiracy to discharge oil into the navigable waters of the United States in violation of 33 U.S.C. § 1319(c) and § 1321(b)(3). Count One also charged RCCL and a crew member with conspiracy to use false writings in violation of 18 U.S.C. § 1001. Count Two charged RCCL with knowingly discharging a harmful quantity of oil into the navigable waters of the United States in violation of 33 U.S.C. § 1319(c)(2)(A) and § 1321(b)(3). Count Three charged RCCL with a failure to report harmful discharges to the appropriate United States agency in violation of 33 U.S.C. § 1321(b)(5). Count Four charged RCCL with using a false writing to make a false statement to the Coast Guard in the form of a falsified Oil Record Book representing that no discharges of contaminated bilge waste were made without the use of the Oil Water Separator in violation of 18 U.S.C. § 1001. Count Five charged RCCL and a crew member with making false statements to a Coast Guard official in violation of 18 U.S.C. § 1001. Count Six charged RCCL and a crew member with making false statements to a Coast Guard official in violation of 18 U.S.C. § 1001, by stating that the Oil Water Separator was working properly when it was not. Counts Seven and Eight charged RCCL and a crew member with witness tampering in violation of 18 U.S.C. § 1512(b)(3) and § 1512(b)(1). Count Nine charged RCCL and a crew member with witness tampering in violation of 18 U.S.C. § 1512(b)(1). Finally, Count Ten charged RCCL and a crew member with obstruction of justice in violation of 18 U.S.C. § 1512(b)(2)(B). *Royal Caribbean Cruises, Ltd.,* 24 F.Supp.2d at 158.

within the Southern District of Florida" in violation of 18 U.S.C. § 1001.[5] *Id.* at 1362. RCCL once again invoked the provisions of UNCLOS and urged the district court to apply them for three reasons.[6]

First, RCCL urged the district court to follow the opinion in the Puerto Rico RCCL case and hold that UNCLOS should be considered as binding on the United States from the date of its submission by the President to the Senate on September 23, 1994. *Id.* at 1368. Secondly, RCCL argued that customary law principles, which can be binding as a component of domestic law, required the district court to consider UNCLOS as setting forth binding principles of international law. *Id.* And third, RCCL argued that the principle of customary law in connection with the Law of the Sea Convention, which binds the United States by Article 18 of the Vienna Convention on the Law of Treaties, provides that a country which has expressed its consent to be bound by an international treaty, including one not yet entered into, shall not engage in any acts which would defeat the object and purposes of the agreement. *Id.*

The Miami RCCL court first addressed whether UNCLOS should be accorded the weight of law. *Id.* at 1370. The district court held that it was "not convinced that UNCLOS, a treaty which all parties agree applies to protect navigational freedoms and the law of the sea, has any bearing on this domestic prosecution. The alleged crime occurred in port in Miami, Florida and involved the presentation of a materi-

ally false writing to the United States Coast Guard." *Id.* The district court noted that the fact that international issues are implicated is not enough to divest the United States of jurisdiction and that the presentation of a false Oil Record Book seemed more appropriately characterized as a domestic law violation over which the United States properly has jurisdiction. *Id.* at 1371. The court further recognized that the gravamen of the action was not the pollution and not the Oil Record Book violation occurring at that time, but the misrepresentation made while in port. *Id.* As a result, the district court found that the proceeding was not properly characterized as "in respect to a pollution incident" so that UNCLOS, a convention addressing the law of the sea was applicable. *Id.*

The Miami court continued in its analysis, and assumed, *arguendo*, that UNCLOS may be raised as a potential issue. *Id.* Rejecting RCCL's argument that collateral estoppel mandated that the district court consider UNCLOS as binding on the United States, the court noted that the Puerto Rico RCCL court was asked to determine the weight of law to give UNCLOS under the circumstances of *that* case. *Id.* at 1372 (emphasis added).

The Miami court then acknowledged that it did appear that UNCLOS is properly considered customary international law. *Id.* The district court found no authority for the proposition that customary international law is properly self-executing so as to afford RCCL standing to litigate its rights under UNCLOS. *Id.* However, the

---

5. The Indictment alleged that the Oil Record Book falsely represented that all overboard discharges of oil contaminated bilge occurred only after treatment of the bilge waste through 15 parts per million equipment, that is, the Oil Water Separator, and which failed to record the overboard discharge of oil contaminated bilge waste without the use of the Oil Water Separator. *Id.* at 1362.

6. RCCL argued that this prosecution violated the international equivalent of a double jeopardy prohibition contained in UNCLOS Article 228, the statute of limitations provision of Article 228.2, and the prohibition from initiating a prosecution absent a request from the flag state or the state damaged or threatened by the discharge violation set forth in Article 218.2. *Id.* at 1362.

district court did not need to decide if UNCLOS was self-executing because it found no specific right of private action in UNCLOS that would provide an individual litigant redress under UNCLOS. *Id.* at 1373. Since there was no private right of action, RCCL did not have standing to litigate its rights under UNCLOS. *Id.* Accordingly, the Court denied RCCL's motion to dismiss on that ground. *Id.*

This Court finds Judge Middlebrooks' reasoning and analysis in the Miami case to be very persuasive. The crimes alleged here in the Second Superseding Indictment concern crimes which occurred, in part, in the Eastern District of Texas. Jho is not charged with committing discharge violations in the territorial sea. In this case, UNCLOS does not divest the Court of jurisdiction and is not applicable.

Although UNCLOS was signed by the United States in 1994 and sent to the United States Senate, it has not been ratified by the Senate and does not have the force of law. *United States v. Best,* 304 F.3d 308, 315 (3rd Cir.2002). In any event, even if the United States were a party to UNCLOS, as discussed *supra,* Jho has no standing to assert rights under the treaty. Treaty rights accrue to sovereign nations, not to private persons such as Jho. Treaties are contracts between or among independent nations and, as such, do not create rights that are privately enforceable. *United States v. Jimenez–Nava,* 243 F.3d 192, 195 (5th Cir.2001), *cert. denied* 533 U.S. 962, 121 S.Ct. 2620, 150 L.Ed.2d 773 (2001). This Court agrees with the Miami RCCL court that it does appear that UNCLOS is properly considered customary international law. *See also Mayaguezanos Por La Salud Y El Ambiente v. United States,* 198 F.3d 297, 304 n. 14 (1st Cir.1999). Even so, this Court also finds that Jho still does not have standing. A violation of international common law does not affect the Court's

jurisdiction. *See United States v. Williams,* 617 F.2d 1063, 1090 (5th Cir. 1980). In addition, there is no specific right of private action in UNCLOS which would provide Jho redress. *See Royal Caribbean Cruises, Ltd.* (Miami RCCL), 11 F.Supp.2d at 1373.

Finally, on its face, UNCLOS Article 230.2 *does not* provide that a seaman on a foreign flagged vessel cannot be prosecuted by the United States government for violations of pollution laws in the territorial sea. It clearly states that, if UNCLOS does apply, only monetary penalties may be imposed. Therefore, even if Article 230.2 applies in this case, it does not require dismissal of the Second Superseding Indictment.

### Fair Notice

According to Jho's motion, the Government alleges in each count of the Second Superseding Indictment that he had a duty to record an entry into the Oil Record Book anytime he knew that the oil pollution equipment on the *Pacific Ruby* was not operating properly. Jho asserts that MARPOL regulations do not require him to make such entries. Further, he also notes that a violation of 18 U.S.C. § 1519 (obstruction of justice) was an object of the conspiracy. Jho contends that there is no allegation that the Coast Guard inspection had proceeded to a formal investigation or that he knew that an investigation had commenced. He therefore concludes that the statutes and regulations advanced by the Government do not give fair warning that the conduct alleged in the Second Superseding Indictment is prohibited.

A criminal statute is void for vagueness under the Due Process Clause of the Constitution when it fails to provide a person of ordinary intelligence fair notice of the conduct it proscribes. *See United States v. Harriss,* 347 U.S. 612, 617, 74

S.Ct. 808, 98 L.Ed. 989 (1954). "The void for vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). It is appropriate to consider an individual's specialized knowledge or experience when considering fair notice. In addition, the requirement that statutes give fair notice cannot be used as a shield by someone who is already intent on wrongdoing. *United States v. Tansley*, 986 F.2d 880, 885 (5th Cir.1993); *see also United States v. Brewer*, 835 F.2d 550, 553 (5th Cir.1987)(defendant should have known that hacking out long distance access codes to obtain free long distance service was wrong).

a). *Fair notice—conspiracy to make false statements under 18 U.S.C. § 1001*

Count 1 of the Second Superseding Indictment alleges, in part that Defendants conspired with others to "violate the laws of the United States as set forth below: **False Statements:** To knowingly and willfully make false statements and use false writings in a matter within the jurisdiction of the U.S. Coast Guard and Department of Homeland Security, knowing the same to contain materially false, fictitious, and fraudulent entries, namely a false Oil Record Book for the *Pacific Ruby* that contained materially false statements and from which other material information was omitted, for the purpose of concealing overboard discharges of bilge waste made while tricking required oil pollution prevention equipment and creating the overall impression that the vessel was being operated properly and was properly maintaining the Oil Record Book, in violation of Title 18, United States Code, section 1001(a)(3);"

Jho asserts that he was not sufficiently on notice that his conduct was unlawful. He contends that regulations do not require an entry to be made in the Oil Record Book regarding whether the use of equipment was "proper". Jho complains that the Indictment does not allege that: the entries failed to include the information required by MARPOL; the discharges did not go through the pollution control equipment; any discharge exceeded the regulatory limit; his conduct violated a regulation prohibiting tampering with equipment; or that he was responsible for maintenance of the Oil Record Book.

■ This Court agrees with the Government that the doctrines of fair notice, rule of lenity or void for vagueness do not apply to Title 18, United States Code, Section 1001. *See Royal Caribbean, Ltd.* (Miami RCCL), 11 F.Supp.2d at 1366. In no uncertain terms, APPS states that a person who knowingly violates the statute, the MARPOL Protocol (including Annexes I, II, and V of MARPOL) or a regulation issued thereunder commits a class D felony. 33 U.S.C. § 1908(a). Annex I, Regulation 9 states that the discharge of oily mixtures are prohibited unless made with a properly functioning oil discharge monitoring and control system. 33 C.F.R. § 151.25 provides that entries shall be made regarding disposal of bilge water that has accumulated in machinery spaces. MARPOL also provides that an entry should be made in the Oil Record Book when the control system fails which includes a reason for failure. MARPOL, Annex I, Appendix III(F). If the system is being bypassed, or "tricked", it has obviously failed, and the regulations require that the appropriate notation be made in the Oil Record Book. The Government alleges that Jho affirmatively indicated in

the Oil Record Book that the discharges were made through the 15 ppm equipment when they were not because the system was "tricked". This Court concludes that the statutes and regulations are clear. Jho is allegedly the individual who maintained overall responsibility for the operation of the engine department, the Oil Water Separator, and other pollution control equipment. *See Second Superseding Indictment*, ¶ 4. The statute and the accompanying regulations give an individual such as Jho fair notice that such activities (tricking the pollution control equipment and failing to make appropriate notations in the Oil Record Book) are prohibited by law.

b). *Fair Notice: 33 U.S.C. § 1908(a) and 33 C.F.R. §§ 151.25(a)and (h)*

Count 1 of the Second Superseding Indictment alleges, in part, that Defendants conspired with others to "violate the laws of the United States as set forth below:
**B. *Failure to Maintain Oil Record Book:*** To knowingly fail to maintain an Oil Record Book for the *Pacific Ruby* in which did knowingly fail to maintain an Oil Record Book for the *Pacific Ruby* in which all disposals of oil residue and discharges overboard and disposals otherwise of oily mixtures, slops from bilges and bilge water that accumulated in machinery spaces were fully recorded, in violation of Title 33, United States Code, Section 1908(a) and Title 33, Code of Federal Regulations, sections 151.25(a) and 151.25(h)".

 As stated above, it appears that the statutes and corresponding regulations unequivocally require the recording of the discharges of oily mixtures and that a notation be made when there is a system failure or exceptional discharge. The language set forth above in the Second Superseding Indictment gives sufficient notice of the charge.

Jho contends that the charging instrument does not allege that he was the Master or otherwise the person in charge of the *Pacific Ruby* so as to be responsible for the "maintenance" of the Oil Record Book under 33 C.F.R. § 151.25(j). Under 33 C.F.R. § 151.25, "maintenance" of the Oil Record Book is the responsibility of the Master or person in charge of the ship. The Government argues that the plain language of the statutes indicate that the person in charge of the engine room operation (Jho) had the duty to make the appropriate accurate entries and that more than one person can be "persons" in charge.

In Count 1 of the Second Superseding Indictment, Jho is charged with conspiring with others to fail to maintain an accurate Oil Record Book. Assuming, *arguendo*, that the sole duty for the maintenance of the Oil Record Book is with the Master or person in charge of the ship, dismissal of this particular object of the conspiracy is not warranted since other co-conspirators may have been in charge of the ship at the times in question. That may be a factual issue for trial, but is not something that this Court should consider for purposes of a motion to dismiss an indictment. *See United States v. Knox*, 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969) (on a motion to dismiss an indictment, the court is only to consider those objections which are capable of determination without the trial of the general issue; evidentiary or factual questions should not be determined at this stage). This Court cannot predict what evidence will be adduced at trial.

c). *Fair Notice: Conspiracy to Violate 18 U.S.C. § 1519*

Count 1 of the Second Superseding Indictment alleges, in part that Defendants conspired with others to "violate the laws of the United States as set forth below:

C. **Obstruction:** To knowingly alter, conceal, cover up, falsify, or make a false entry in any record or document with the intent to impede, obstruct, or influence the investigation and proper administration of a matter within the jurisdiction of the U.S. Coast Guard and Department of Homeland Security and in relation to and in contemplation of a matter, namely, the U.S. Coast Guard's inspections to determine the *Pacific Ruby's* compliance with MARPOL and United States laws, in violation of Title 18, United States Code, section 1519."

In his motion, Jho argues that a routine Coast Guard inspection is not an "investigation" within the ambit of 18 U.S.C. § 1519. Jho further argues that to knowingly obstruct an investigation, an investigation must be underway, he must know of the investigation, and then he must alter or destroy documents with the intent to obstruct that investigation. He asserts that there is no evidence nor allegation that he knew of a pending investigation. Jho further argues that Section 1519 is unconstitutional because it dispenses with a *mens rea* requirement.

Title 18, United States Code, Section 1519 provides, in part:

"Whoever *knowingly* alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object *with the intent to impede, obstruct, or influence the investigation, or proper administration of any matter* within the jurisdiction of any department or agency of the United States ... shall be fined ... imprisoned ..." (emphasis added)

▮ Jho's first argument that there must be a pending "investigation" before liability can attach is not persuasive. This Court agrees with the Government that Congress apparently included the terms "investigation or proper administration of any matter" to distinguish § 1519 from other obstruction of justice statutes. Limiting the reach of § 1519 to "investigations" ignores Congress' intent that the statute apply to obstructive conduct which relates to "the proper administration of any matter".

Congress apparently developed Section 1519 as a part of the Sarbanes–Oxley Act [7] to remedy the "loopholes" created by the "patchwork" of the other obstruction of justice statutes contained in Title 18:

"Section 1519 is meant to apply broadly to any acts to destroy or fabricate physical evidence so long as they are done with the intent to obstruct, impede or influence the investigation of proper administration of any matter, and such matter is within the jurisdiction of an agency of the United States, or such acts done either in relation to *or in contemplation of such a matter or investigation.* This statute is specifically meant not to include any technical requirement, which some courts have read into other obstruction of justice statutes, to tie the obstructive conduct to a pending or imminent proceeding or matter. It is also sufficient that the act is done 'in contemplation' of or in relation to a matter or regulation. *It is also meant to do away with the distinctions, which some courts have read into obstruction statutes, between court proceedings, investigations, regulatory or administrative proceedings (whether formal or not), and less formal government inquiries, regardless of their title.* Destroying or falsifying documents to obstruct any of these types of matters or investigations, which in fact are proved to be within the jurisdiction of any federal agency are covered by this statute ... The intent of the provision is simple;

**7.** *See* 18 U.S.C. § 1350

people should not be destroying, altering, or falsifying documents to obstruct any government function."

S. REP. No. 107–146, pp. 14–15 (2002)(emphasis added).

An excellent discussion of the legislative history and intent of Section 1519 can be found in *Anticipatory Obstruction of Justice: Pre-emptive Document Destruction Under the Sarbanes–Oxley Anti–Shredding Statute, 18 U.S.C. § 1519,* Cornell Law Review, September 2004[8]. The article points out that Senator Patrick Leahy, then Chairman of the Committee on the Judiciary and drafter of the obstruction of justice provisions of the Sarbanes–Oxley bill, noted that the drafters intended the new obstruction statute to apply broadly and be bound only by an "intent" element and a "jurisdictional" element. 89 CORNELL L. REV. 1519, 1559. Before the final vote on the Sarbanes–Oxley bill, Leahy described the "intent" element of Section 1519 in detail:

"This section would create a new 20 year felony which could be effectively used in a wide array of cases where a person destroys or creates evidence with the intent to obstruct an investigation or matter that is, as a factual matter, within the jurisdiction of any federal agency or any bankruptcy. It also covers acts either in contemplation of or in relation to such matters."

148 CONG. REC. S7, 418 (daily ed. July 26, 2002) (statement of Senator Leahy). Senator Leahy continued, stating:

"[T]he intent required is the intent to obstruct, not some level about the agency processes of [sic] the precise nature of the agency of [sic] court's jurisdiction. This statute is specifically meant not to include any technical requirement, which some courts have read into other obstruction of justice statutes, to tie the obstructive conduct to a pending or imminent proceeding or matter by intent or otherwise."

*Id.* at 519.

Later, Mr. Leahy described the difference between Section 1512 and Section 1519. 89 CORNELL LAW REV., at 1564. He emphasized that Section 1519 was drafted in order to avoid the requirement that the defendant know about the proceeding against him:

"[Section] 1519 requires only proof of the defendant's intent to obstruct, impede, or influence and not any link to the defendant's knowledge about the nature of the government's jurisdiction . . ."

*Id.* (Quoting letter from Patrick Leahy, U.S. Senator, to John Ashcroft, Attorney General, U.S. Dep't of Justice pp. 2–3 (Aug. 2, 2002) (on file with law review article author)).

Accordingly, the Court concludes that imposing a requirement that the matter develop into a formal investigation ignores the plain meaning of the statute and the legislative history. All that is required is proof that Jho knowingly made false entries in a document (the Oil Record Book) with the intent to impede, obstruct, or influence the proper administration of any matter within the jurisdiction of the United States Coast Guard. As noted in the legislative history, it is also sufficient that the act is done "in contemplation" of or in relation to a matter or regulation.

The Second Superseding Indictment properly charges a conspiracy offense with the object of the conspiracy being a violation of Section 1519. Jho may be found guilty if a jury concludes and the facts establish beyond a reasonable doubt that he conspired to knowingly falsify the entries in the Oil Record Book with the

---

8. Dana E. Hill, author; 90 CORNELL L. REV. 1519 (2004).

specific intent to obstruct a matter within the jurisdiction of the Coast Guard.[9]

### Request for Dismissal of Count 2 (18 U.S.C. § 1001)

Title 18, United States Code § 1001 provides that "(a) . . . whoever . . . knowingly and willfully

(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

(2) makes any false, fictitious, or fraudulent statement or representation; or

(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry shall be fined under this title . . .

Count 2 of the Second Superseding Indictment alleges that Jho, on or about September 15, 2005, in Port Neches, Texas, in the Eastern District of Texas:

"made and used a false and fictitious Oil Record Book that stated that a discharge had been made on September 11, 2005 "with 15 ppm equipped" and created the overall false and misleading impression, through materially false and misleading entries and omissions, that the vessel was being operated properly, when Defendant Jho knew then and there that the fifteen (15) ppm equipment, namely the Oil Content Meter, was being flushed with fresh water, and was not sensing a true sample of the oily mixture, slops from bilges and bilge water that had accumulated in machinery spaces that were being discharged overboard.

All in violation of Title 18, United States Code, sections 1001(a)(3) and (2)."

### a). *General allegation of no legal duty to disclose*

Defendant argues that the conduct charged in Count 2 consists of concealment or omission. He cites several cases from other circuits which stand for the proposition that one cannot be guilty of concealing material facts within the jurisdiction of a federal agency if there is no duty to disclose those facts. The Government responds that while proof of a legal duty is not an element of 18 U.S.C. § 1001, Defendant was the person who was assigned the responsibility for the Oil Record Book and made the false entries and omissions in this matter. It is indisputable that Jho would be liable under Section 1001(a)(3) for making affirmatively false representations, i.e. the "materially false and misleading entries". The seminal question is whether, under Section 1001(a)(3), there must be a duty to disclose entries that were omitted from the Oil Record Book. What complicates matters is that the Government has indicted Jho under a false statement prong of Section 1001, however, the essence of the charge, at least as it pertains to the omissions, is that Jho tricked or caused to be tricked the pollution control equipment and did not enter a notation in the Oil Record Book that the system had failed. This does sound like concealment, even though it is charged under Section 1001(a)(3).

One appellate court has held that Section 1001 encompasses two distinct offenses; the concealment of a material fact prohibited by § 1001(a)(1) and the making of a false statement prohibited under § 1001(a)(2). *United States v. Shaw*, 150 Fed.Appx. 863, 877 (10th Cir.2005), *cert. denied*, — U.S. —, 126 S.Ct. 2039, 164 L.Ed.2d 783 (2006). Conviction under

---

**9.** Section 1519 contains a *mens rea* requirement in that it requires that the defendant act *knowingly* with the *intent* to obstruct justice.

1001(a)(1) requires proof that the defendant had a legal duty to disclose the fact concealed, while a conviction under 1001(a)(2) does not. *Id.* Unfortunately, in *Shaw*, the Tenth Circuit Court of Appeals did not specifically address the question of whether Section 1001(a)(3) requires a duty to disclose in the context of an omission. However, it should be noted that the language of 1001(a)(2) is virtually identical to that of 1001(a)(3) except that 1001(a)(3) involves a false writing or document. Further, proof of a legal duty to disclose is not an element of 18 U.S.C. § 1001(a)(3). *United States v. Puente,* 982 F.2d 156, 158 (5th Cir.1993), *cert. denied* 508 U.S. 962, 113 S.Ct. 2934, 124 L.Ed.2d 684 (1993) (what must be proven is that there was a statement that is false and material, made with the requisite specific intent, and within the purview of government agency jurisdiction) (citing *United States v. Lichenstein,* 610 F.2d 1272, 1276 (5th Cir.1980), *cert. denied* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980)).

 Even assuming that a duty to disclose is required, this Court finds that the Second Superseding Indictment properly alleged and charges that Jho tricked the pollution control equipment and failed to make the appropriate notation in the Oil Record Book. Whoever on board the ship was assigned the duty to make these specific notations had a duty to record details regarding the failure of the pollution control system. MARPOL, Annex I, Appendix III(F). The Government alleges that Jho was assigned responsibility for the Oil Record Book and actually made the false entries and omissions.

Although the duty to "maintain" the Oil Record Book falls upon the Master or "other person having charge of a ship", the duty to make appropriate entries concerning the discharge of bilge water which accumulates in machinery spaces falls upon the person in charge of the operation. *See* 33 C.F.R. § 151.25(d), (h), and (j). In addition, in Count 2, Jho is also charged with aiding and abetting this offense under 18 U.S.C. § 2. In testing the sufficiency of the indictment, a court must not pierce the proceedings and make a premature resolution of the merits of the allegations. *United States v. Cadillac Overall Supply Co.,* 568 F.2d 1078, 1083 (5th Cir.1978), *cert. denied* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (citations omitted). Further, as stated *supra,* on a motion to dismiss an indictment, the court is only to consider those objections which are capable of determination without the trial of the general issue; evidentiary or factual questions should not be determined at this stage. *United States v. Knox,* 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969). Even assuming that only the Master or other person in charge of the ship had the duty to make these particular entries, this Court cannot look into the future to foresee whether the Government will introduce evidence that Jho aided and abetted the Master or other person in charge of the ship. Jho's motion to dismiss should be denied in this regard.

b). *Is the conduct alleged within the jurisdiction of the Coast Guard?*

Jho argues that the facts relating to the alleged discharge in this matter bears some resemblance to the discharge in *United States v. Royal Caribbean Cruises, Ltd.,*[10] the Miami RCCL district court case discussed above. According to Jho, in the Miami RCCL case, the Government did not charge the unlawful discharge which occurred outside the twelve mile limit of the territorial sea as a substantive offense in the indictment and agreed that the discharge was not within U.S. waters. How-

10. 11 F.Supp.2d 1358 (S.D.Fla.1998)

ever, Jho alleges that the Government argued that the Section 1001 prosecution was appropriate because the Oil Record Book presented to the Coast Guard when the ship was in port included alleged false statements about activities that occurred within United States waters. Jho contends that the Government's argument in the Miami case is an admission that a false statement concerning the discharge of bilge does not come within the jurisdiction of Title 18, United States Code, § 1001, unless it concerns an event that occurred while the ship was in the territorial waters of the United States.

The Government argues that the fact that false entries and omissions in the Oil Record Book may pertain to discharges which may have take place outside of United States' waters has no bearing on the Government's jurisdiction to enforce its laws in port regarding false statements made to a United States agency. According to the Government, even if this case were about acts outside United States' territorial waters, longstanding precedent in this Circuit establish that the United States has jurisdiction over extraterritorial acts that have an impact on the United States.

Again, we look to the Miami district court's opinion in *United States v. Royal Caribbean Cruises, Ltd.,* for guidance on this issue. Royal Caribbean argued that since the Government had no authority to regulate conduct occurring outside the navigable waters of the United States, the Oil Record Book and its entries or lack thereof were not within the jurisdiction of the United States, much less the United States Coast Guard. *Id.* at 1362.

The Miami district court noted that the United States Supreme Court stated that jurisdiction within the meaning of section 1001 should not be narrowly or technically defined. *Id.* (Citing *United States v. Herring,* 916 F.2d 1543, 1547 (11th Cir.1990), *cert. denied* 500 U.S. 946, 111 S.Ct. 2248, 114 L.Ed.2d 488 (citing *United States v. Rodgers,* 466 U.S. 475, 480, 104 S.Ct. 1942, 1946, 80 L.Ed.2d 492 (1984))). "Under the law as developed in the Eleventh Circuit, the fact that the alleged statement in a § 1001 case was not within the jurisdictional bounds of the United States is not fatal to the claim." *Id.* (Citing *United States v. Cox,* 696 F.2d 1294 (11th Cir.1983))(upholding conviction for § 1001 violation where relevant documents were filled out in Guatemala). The Miami district court concluded that whether or not the United States has the authority to regulate the unauthorized discharge at the time it occurred did not bear on the court's inquiry as to whether the United States had jurisdiction to enforce its laws in an American port regarding the commission of false statements made to a United States agency performing its proper duties. *Id.* at 1364.

In *Bryson v. United States* [11], the Supreme Court stated that the term " 'jurisdiction' should not be given a narrow or technical meaning for purposes of § 1001." The Coast Guard is authorized to conduct inspections of vessels to determine compliance with MARPOL, APPS, and related regulations, and is specifically authorized to examine a vessel's Oil Record Book pursuant to 33 C.F.R. § 151.23(a)(3) & (c). These inspections are regularly conducted activities of the Coast Guard. Defendant has cited no authority which suggests that the United States has no jurisdiction over false statements made in port concerning discharges made at sea which may be beyond the United States' jurisdiction to regulate. This Court agrees that "[t]o find the contrary would raise serious questions about the government's ability to enforce,

11. 396 U.S. 64, 70, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969).

as a matter of domestic law, false statements made in connection with such matters as bank fraud, immigration, and visa cases, where the statements at issue were made outside of the United States, perhaps acceptable or in the alternative unnecessary under the appropriate foreign regulatory scheme, but nonetheless illegal under United States law." *Royal Caribbean Cruises, Ltd.*, 11 F.Supp.2d at 1364.

In addition, an alternate basis for jurisdiction exists. Jurisdiction of the United States embraces offenses which have an effect within its sovereign territory, even though the acts constituting the offense occurred outside of the United States. *United States v. Williams*, 617 F.2d 1063, 1076 (5th Cir.1980) (en banc). Presentation of a false Oil Record Book to Coast Guard officials conducting an inspection pursuant to United States' laws and regulations certainly has an effect within the sovereign territory. *Royal Caribbean Cruises, Ltd.*, 11 F.Supp.2d at 1364.

c.) *Materiality*

■ Jho contends that MARPOL and the regulations do not require an entry that fresh water was used to flush the Oil Content Meter, particularly when the Second Superseding Indictment does not allege that bilge water exceeded the regulatory limit or that bilge water did not pass through the 15 ppm equipment before it was discharged. Defendant argues that the statements attributable to him are not material for purposes of Title 18, United States Code, Section 1001.

The Government responds that Counts 1 and 2 of the Second Superseding Indictment allege that Defendant affirmatively claimed that the discharges were made with 15 ppm equipment when he knew that the equipment was being "tricked" and not in operation as required. The Government also argues that, in the Oil Record Book, Defendant omitted entries which corre-sponded to system failures and exceptional discharges. The Government argues that these statements and omissions had a natural tendency to influence the exercise of the Coast Guard's authority.

Again, a violation of 18 U.S.C. section 1001 requires five elements: (1) a statement, that is (2) false (3) and material, (4) made with the requisite specific intent, and (5) within the purview of government agency jurisdiction. *United States v. Puente*, 982 F.2d 156, 158 (5th Cir.1993), cert. denied 508 U.S. 962, 113 S.Ct. 2934, 124 L.Ed.2d 684 (1993). A material statement is one that has a natural tendency to influence, or one that is capable of affecting or influencing a government function. *Id.* at 159. Actual influence or reliance by a government agency is not required. *Id.* The statement may be material even if it is ignored or never read by the agency receiving the misstatement. *Id.* On one hand, Defendant appears to be arguing that the indictment fails to sufficiently allege materiality, considering the Defendant's argument that he was under no duty to make an entry concerning the "tricking" of the equipment.

In determining whether an indictment sufficiently alleges materiality, the Court looks to whether the statement or representation alleged to be false could conceivably have a tendency or capacity to influence or affect a government function; that is, whether it is potentially capable of being proved material by the government at trial. *United States v. McGough*, 510 F.2d 598, 602 (5th Cir.1975). If the facts alleged in the indictment warrant an inference that the false statement is material, the indictment if not fatally insufficient for its failure to allege materiality *haec verba*. *Id.*

The Coast Guard is specifically authorized to board a ship to determine whether the vessel has discharged any oil or oily

mixtures on violation of MARPOL and the Coast Guard officers are entitled to inspect the Oil Record Book, Oil Content Meter, and other equipment on the vessel. *See* 33 C.F.R. § 151.23(a)(3) & (c). In its response, the Government contends that Defendant made entries in the Oil Record Book that discharges were made "with" or "through" 15 ppm equipment when they were not and that he used the MARPOL code of "15.1" which indicated that the discharge was made through the 15 ppm equipment, even though it was not. The Government contends that Defendant omitted specific information which concealed the condition of the *Pacific Ruby's* pollution monitoring system. The Government contends that Defendant was required to make an entry "F" in the Oil Record Book to denote the operational failure of the system when Defendant or others were "tricking" the equipment. The Government also alleges that Defendant failed to enter "G" in the Oil Record Book when there was an exceptional discharge and that he failed to do so.[12]

This Court disagrees with Jho's contention that there was no requirement to make the appropriate entry into the Oil Record Book when the system was rendered ineffective by being flushed with fresh water. As stated above, under the regulations, the person in charge of the operations has the duty to make an entry when the overboard discharges were made. Further, it is of no consequence that the Government allegedly cannot prove that any alleged discharge exceeded 15 ppm of oil. The regulations require that the oil pollution equipment be in operation. It is a material misrepresentation to falsely indicate that pollution equipment

on an oil tanker is properly working when, in fact, it had been disabled. These alleged statements and omissions, in an Oil Record Book which the Coast Guard has the lawful authority to inspect, would have a natural tendency to influence, or be capable of affecting or influencing the Coast Guard's mission of investigating violations of MARPOL, APPS, and other federal regulations concerning pollution of the seas and waterways.

### d). *Paperwork Reduction Act*

Jho argues that Count 2 should be dismissed based on the Government's noncompliance with the Paperwork Reduction Act (PRA). Jho notes that the Oil Record Book provided to United States Ships has an OMB (Office of Management and Budget) approval number but that the Oil Record Book provided to him in discovery does not contain such a number.

The purpose of the Paperwork Reduction Act of 1980 is to minimize the federal paperwork burden for individuals, small businesses, state and local government, and other persons resulting from the collection of information by or for the Federal Government. *See* 44 U.S.C. § 3501(1). Approved information requests are assigned an OMB number. *See Holliday v. Comm'r*, T.C. Memo 2005–240 (citing 44 U.S.C. § 3507(a)). Importantly, Section 3512 of the PRA provides that "no person shall be subject to any penalty for failing to comply with a collection of information that is subject to this subchapter if . . . the collection of information does not display a valid control number assigned by the Director in accordance with this sub-

---

12. Defendant is correct that the regulations do not specifically require that an entry be placed in the Oil Record Book to indicate that the system was "tricked" and flushed with fresh water. Drafters of the regulations could not conceive each and every way that some-

one may illegally tamper with oil pollution equipment on an oil tanker. The regulations do require an entry in the case of failure of the equipment and when there is an exceptional discharge. *See* MARPOL, Annex I, Appendix III(F); 33 C.F.R. § 151.25(g).

chapter." 44 U.S.C. § 3512(a). This section protects a person from penalties for failing to file information; it does not protect an individual who files information which is false. *United States v. Weiss,* 914 F.2d 1514, 1520 (2nd Cir.1990), *cert. denied* 502 U.S. 842, 112 S.Ct. 133, 116 L.Ed.2d 100 (1991); *United States v. Sasser,* 974 F.2d 1544, 1554–55 (10th Cir.1992), *cert denied,* 506 U.S. 1085, 113 S.Ct. 1063, 122 L.Ed.2d 368 (1995).

■ In addition, the PRA is inapplicable to information required to be provided by statute, as opposed to agency regulations. *United States v. Kerwin,* 945 F.2d 92 (5th Cir.1991) (per curiam) (the PRA does not apply to the statutory requirement that a taxpayer must file a tax return); *United States v. Hicks,* 947 F.2d 1356, 1359 (9th Cir.1991)("The PRA is aimed at reining in agency activity. When Congress sets forth an explicit statutory requirement and provides criminal penalties for failure to comply, that is another matter").

Accordingly, based upon the case law and the PRA, this Court agrees with the Government that the legal requirement that the *Pacific Ruby* maintain an Oil Record Book originated in MARPOL which was incorporated into United States law by APPS. For the reasons set forth above, because the maintenance of an Oil Record Book is required by federal law and regulations, the PRA does not apply in this case.

### Dismissal of the Counts brought under 33 U.S.C. § 1908(a)

Counts 3—10 of the Second Superseding Indictment allege violations of the Act to Prevent Pollution from Ships, Title 33, United States Code, Section 1908(a). These counts allege that Defendant knowingly failed to maintain an Oil Record Book "by failing to disclose exceptional discharges in which overboard discharges of oily mixtures, slops from bilges and bilge water that accumulated in machinery spaces had been made without the use of a properly functioning Oil Water Separator and Oil Content Meter and falsely indicating the proper use of required pollution prevention equipment" on eight dates at locations within the Eastern District of Texas, in violation of Title 33, United States Code, Section 1908(a), Title 18, United States Code, Section 2, and Title 33, Code of Federal Regulations, Section 151.25. *See Second Superseding Indictment, Counts 3—10.* In his motion to dismiss, Defendant contends that these counts should be dismissed, arguing that he is not responsible for maintaining the Oil Record Book, the alleged false statements are not subject to criminal sanctions, and that the information allegedly omitted from the Oil Record Book was not a required entry.

#### a). *Responsibility for Maintaining the Oil Record Book*

Defendant argues that the Government alleges only that Defendant was in charge of the engine room of the *Pacific Ruby,* not the entire ship. According to Defendant, under 33 C.F.R. § 151.25(h), responsibility for maintenance of the Oil Record Book rests with the master or other person in charge of the ship.

The Government answers that MARPOL and APPS clearly place the obligation to make entries in the Oil Record Book on the person in charge of the operation, in this case Defendant. Further, the Government responds that Defendant is also charged with violations of Title 18, United States Code, Section 2 (aiding and abetting).

Title 33, United States Code, Section 1908(a) provides that "[a] person who violates the MARPOL Protocol, ... this chapter, or the regulations issued thereun-

der commits a class D felony." 33 U.S.C. § 1908(a). Discharges from the machinery spaces must be recorded in the Oil Record Book and any "exceptional" discharge should also be recorded. 33 C.F.R. §§ 151.25(d) and (g). 33 C.F.R. § 151.25(h) further provides that entries concerning these discharges "shall be signed by the person or persons in charge of the operations concerned and each completed page shall be signed by the master or other person having charge of the ship." 33 C.F.R. § 151.25(h). The master or other person having charge of a ship required to keep an Oil Record Book is responsible for the maintenance of such record. 33 C.F.R. § 151.25(j).

 There is little doubt that Defendant, if he did indeed have the overall responsibility for the operations relating to the discharges as the Second Superseding Indictment alleges, had the duty to "sign off" on the entry in the Oil Record Book pertaining to each required entry. Therefore, if Defendant failed to make a required entry, or intentionally made a false entry, in the Oil Record Book he would be in violation of 33 C.F.R. § 151.25, which, in turn, is a violation of 33 U.S.C. § 1908(a). On the other hand, if Defendant (because of his position on the ship), was not required to make the required entries in the Oil Record Book and did not make false entries, he arguably would not be liable for maintaining an inaccurate Oil Record Book because it is not alleged that he is the Master or otherwise in charge of the ship.

The problem which arises here is that it appears that the Government may have indicted Defendant for not "maintaining" an Oil Record Book. It is, of course, argued that he had no duty to maintain the Oil Record Book under 151.25(j)) specifically by failing to disclose exceptional discharges and falsely indicating the use of pollution equipment (which, relatedly, as

the person in charge of the operation, he was required to do).

However, this is not an adequate ground for dismissal at this time. Counts 3–10 charge both Jho and OSG with failure to maintain the Oil Record Book on those specific occasions. As stated above, they are also charged with "aiding and abetting" under 18 U.S.C. § 2. Proof at trial could establish that Jho aided and abetted OSG (owner and operator of the *Pacific Ruby*) or others who were in charge of the ship. Counts 3–10 adequately charge and offense and this Court cannot now say, as a matter of law, that Jho cannot be found guilty of those offenses.

b). *Question of whether the false statements are subject to criminal penalties under APPS*

Title 33, United States Code, Section 1908(a) provides in part:

(a) Criminal penalties; payment for information leading to conviction

A person who knowingly violates the MARPOL Protocol, Annex IV to the Antarctic Protocol, this chapter, or the regulations issued thereunder commits a class D felony.

Title 33, United States Code, Section 1908(b) then provides, in part:

II. Civil penalties; separate violations; assessment notice; considerations affecting amount; payment for information leading to assessment of penalty

A person who is found by the Secretary, after notice and an opportunity for a hearing, to have

(1) violated the MARPOL Protocol, Annex IV to the Antarctic Protocol, this chapter, or the regulations issued thereunder shall be liable to the United States for a civil penalty, not

to exceed $25,000 for each violation; or

(2) made a false, fictitious, or fraudulent statement or representation in any matter in which· a statement or representation is required to be made to the Secretary under the MARPOL Protocol, Annex IV to the Antarctic Protocol, this chapter, or the regulations thereunder, shall be liable to the United States for a civil penalty, not to exceed 5000 for each statement or representation.

Defendant argues that the criminal provisions of APPS (33 U.S.C. § 1908(a)) fail to expressly criminalize the making of false statements and that false statements are expressly provided for in the civil section of APPS (33 U.S.C. § 1908(b)(2)). Defendant contends that the only fair reading of the statute is that false statements are not included among the acts subject to criminal sanctions under APPS.

The Government responds that the civil and criminal provisions of APPS can be read in harmony. According to the Government, Congress intended that the criminal sanctions of APPS be reserved for the worst types of violations—those committed knowingly. The Government notes that, in contrast, the civil penalty provisions, including the civil infraction for making a false statement, have no *mens rea* requirement and may be imposed without proof of intent. The Government concludes that the availability of the lesser penalties for a lesser offense in no way negates or repeals the availability of criminal; penalties when "knowing" conduct is at issue.

■■■■ The starting point for interpreting a statute is an examination of the language of the statute itself. *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004). When construing a criminal statute, we must follow the plain and unambiguous meaning of the statutory language. *Id.* A statute must, if possible, be construed in such a fashion that *every word* has operative effect. *Id.* (emphasis added). It is a cardinal principle of statutory construction that a statute ought to be construed so that no clause, sentence, or word shall be superfluous, void, or insignificant. *Kaltenbach v. Richards,* 464 F.3d 524, 528 (5th Cir.2006). When a statute's language is plain, the sole function of the courts, at least where the disposition required by the text is not absurd, is to enforce it according to its terms. *Carrieri v. Jobs.com, Inc.,* 393 F.3d 508, 518 (5th Cir.2004).

■■■■ This Court finds that 33 U.S.C. § 1908(a) unambiguously provides for criminal penalties for knowing violations of the MARPOL Protocol and the corresponding regulations, while Section 1908(b) unambiguously provides for civil penalties which may not have been committed with the requisite intent. Congress' intentional placement of the word "knowingly" in § 1908(a) indicates its desire to apply harsher sanctions to those who knowingly violate pollution laws. Defendant's reading of the statute ignores Congress' requirement· of *mens rea* before imposing criminal sanctions. Knowingly made false statements can properly be prosecuted under § 1908(a).

c). *Was the information allegedly omitted from the Oil Record Book a required entry?*

Defendant argues that MARPOL does not require an entry concerning when the Oil Content Meter was allegedly being "tricked" that is, flushed with fresh water. This Court disagrees.

Under MARPOL, the discharge of oily mixtures from the machinery spaces of an oil tanker is prohibited unless the ship has in operation the required pollution control equipment. MARPOL, Annex I, Regulation 9(4). "Exceptional" discharges of oily

mixtures must be recorded in the Oil Record Book. 33 C.F.R. § 151.25(g). Regulation 20 of MARPOL and 33 C.F.R. § 151.25(g) require that discharges other than those authorized must be recorded in the Oil Record Book. As stated above, the regulations require an entry to be made when the oil discharge monitoring and control system fails. *See* MARPOL, Annex I, Appendix III(F).

### Conclusion

Accordingly, based upon the legal analysis and discussion set forth herein, the undersigned United States Magistrate recommends that the District Court deny *Defendant Jho's Motion to Dismiss* [Clerk's doc. # 18–1] and *Supplemental Motion to Dismiss* [Clerk's doc. # 63].

### Objections

Pursuant to 28 U.S.C. § 636(b)(1)(c), all parties are entitled to serve and file written objections to the report and recommendation of the magistrate judge within ten (10) days of receipt of this report. Failure to file specific, written objections to the proposed findings of facts, conclusions of law and recommendations contained within this report within ten (10) days after service shall bar an aggrieved party from *de novo* review by the District Judge of the proposed findings, conclusions and recommendations, and from appellate review of factual findings and legal conclusions accepted by the District Court except on grounds of plain error. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Douglass v. United Serv. Auto. Ass'n,* 79 F.3d 1415 (5th Cir.1996) (*en banc*); 28 U.S.C. § 636(b)(1). The constitutional safeguards afforded by Congress and the courts require that, when a party takes advantage

of his right to object to a magistrate's findings or recommendation, a district judge must exercise its nondelegable authority by considering the actual evidence and not merely by reviewing and blindly adopting the magistrate's report and recommendation. *See Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983); *United States v. Elsoffer,* 644 F.2d 357, 359 (5th Cir.1981) (per curiam).

Nov. 13, 2006.

### REPORT AND RECOMMENDATION ON DEFENDANT OVERSEAS SHIPHOLDING GROUP, INC.'S MOTION TO DISMISS

Pursuant to 28 U.S.C. § 636(b) and the Local Rules for the United States District Court for the Eastern District of Texas, the District Court referred this criminal matter to the undersigned United States Magistrate for hearing and submission of findings of fact and a report and recommendation on certain case-dispositive motions. *See Order of Referral* [Clerk's doc. # 70]. Pending before the Court for purposes of this report is *Defendant Overseas Shipholding Group, Inc's Motion to Dismiss Second Superseding Indictment* [Clerk's doc. # 59].

### Background [1]

Defendant Kun Yun Jho (hereinafter referred to as "Jho") was employed as the Chief Engineer of the *M/T Pacific Ruby.* The *M/T Pacific Ruby* is an ocean-going petroleum oil tanker owned and operated by Defendant Overseas Shipholding Group, Inc. (OSG), which is a New York corporation. The *Pacific Ruby* is registered in the Marshall Islands.

---

**1.** The facts are taken from the *Second Superseding Indictment* [Clerk's doc. # 46] on file in this matter.

As Chief Engineer, Jho has the overall responsibility for the operations in the engine room ·of the *Pacific Ruby,* including the responsibility for operating the vessel's anti-pollution equipment and entering information concerning that equipment into a log book (Oil Record Book) which is regularly inspected by the United States Coast Guard. Engine room operations in large marine vessels such as the *Pacific Ruby* generate large quantities of oil-contaminated bilge waste when oil drips from the engine's fuel and lubrication systems and mixes with water in the bottom of the vessel. These "oily mixtures" are also referred to as "bilge slops" or "slops from bilges". The oily mixtures are collected and processed through an Oily Water Separator whereby the water is separated from the oil and other wastes. The mixture is then passed through an oil-sensing device known as an Oil Content Meter. If the Oil Content Meter determines that the oil content of the effluent exceeds fifteen parts per million (15 ppm), alarms sound, and the effluent is automatically directed to a storage tank on the vessel. If the Oil Content Meter determines that the oil content in the effluent is 15 ppm or less, the effluent is discharged overboard.

Apparently, the Oil Content Meter can be "tricked" into erroneously "believing" that the effluent contains 15 ppm or less oil by flushing it with fresh water to skew the oil content reading. Also, the system can apparently be "tricked" by inserting tools or other objects into valves or other pieces of equipment to cause an oily mixture containing oil of 15 ppm or more to be discharged overboard rather than be properly directed to the appropriate storage tank. In response to this, some vessels have "anti-tricking" devices installed to thwart "tricking" of the anti-pollution equipment.

a). *Charges Pending Against OSG and Jho Under the Second Superseding Indictment*

A federal grand jury returned a Second Superseding Indictment [Clerk's doc. # 46] against Jho and OSG on August 16, 2006. Count 1 of the Second Superseding Indictment charges that OSG and its employee and co-defendant Jho conspired to: (1) make false and use false writings in a matter within the jurisdiction of the U.S. Coast Guard and the Department of Homeland Security; (2) fail to maintain an Oil Record Book for the *Pacific Ruby;* and (3) alter, conceal, cover up, falsify, or make a false entry in a record or document with the intent to impede, obstruct, or influence the investigation and proper administration of a matter within the jurisdiction of the U.S. Coast Guard and Department of Homeland Security, all in violation of Title 18, United States Code, Section 371.

The "manner and means" portion of the Second Superseding Indictment sets forth allegations of how Jho, OSG, and others intended to effectuate the conspiracy and further its objectives. The Second Superseding Indictment alleged that the defendants routinely discharged oily mixtures into the ocean with equipment and procedures that prevented the Oil Content Meter from operating as it was designed. It alleges that the defendants taught other individuals to "trick" the Oil Content Meter by flushing it with fresh water to prevent it from sensing an actual sample of the overboard discharge. Jho allegedly taught other members of the conspiracy how to defeat newly installed anti-tricking equipment which would have prevented the use of fresh water to trick the Oil Content Meter. Finally, Jho and OSG also allegedly maintained a false and misleading Oil Record Book and made and caused to be made materially false state-

ments to members of the United States Coast Guard while the *Pacific Ruby* was in port.

The Second Superseding Indictment also sets forth overt acts of the defendants which furthered the conspiracy. The Government alleges that Jho and OSG maintained a false and misleading Oil Record Book on sixteen (16) different occasions while at ports in the Eastern District of Texas. They allege that Jho directed individuals to search for objects to defeat the anti-tricking devices and directed a subordinate to flush the Oil Content Meter with fresh water while creating a record which concealed the tampering. The Government contends that OSG continued to operate the *Pacific Ruby* in United States ports without procedures and precautions to confirm the proper operation of the anti-tricking equipment after learning that the logging device was not properly recording dates. Finally, it is alleged that, on two occasions, Jho and OSG caused the presentation of a false Oil Record Book to members of the United States Coast Guard which failed to record the discharges of oily mixtures.

Count 2 of the Second Superseding Indictment charges Jho and OSG with making false statements in violation of Title 18, United States Code, Sections 1001(a)(3) and 2. It alleges that Jho made and used a false and fictitious Oil Record Book that stated that a discharge had been made on September 11, 2005 "with 15 ppm equipped" which created the false impression, through false and misleading entries and omissions, that the vessel was operating properly when Jho knew that the Oil Content Meter was being flushed with fresh water and not sensing a true sample.

Counts 3 through 10 charge Jho and OSG with knowingly failing to maintain an Oil Record Book, by failing to disclose exceptional discharges in which oily mixtures, slops from bilges and bilge water

that accumulated in machinery spaces had been made without the use of a properly functioning Oil Water Separator and Oil Content Meter and falsely indicating the proper use of required pollution prevention equipment on eight (8) different occasions, all in violation of Title 33, United States Code, Section 1908(a), Title 33 C.F.R., Section 151.25, and Title 18, United States Code, Section 2.

### b). *Applicable Laws and Treaties*

Before the Court are two key instruments setting forth the international legal and regulatory regime addressing the issues of marine pollution on the high seas. The first is the United Nations Convention on the Law of the Sea, 1982 (UNCLOS). The second includes the 1973 International Convention for the Prevention of Pollution from Ships and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships, collectively known as "MARPOL." *United States v. Abrogar*, 459 F.3d 430, 431–32 (3d Cir.2006); *see also* Shaun Gehan, Case Note, *United States v. Royal Caribbean Cruises, Ltd.: Use of Federal 'False Statements Act' to Extend Jurisdiction Over Polluting Incidents into Territorial Seas of Foreign States*, OCEAN & COASTAL L.J. 167, 169 (2002). UNCLOS has more the status of a "constitution of the oceans," whereas MARPOL sets out a detailed regulatory framework, specifically enforceable amongst the signatory states. Gehan, at 169. These treaties are not self-executing, but rather must be implemented by member states through legislation. *Id.* In the United States, Congress codified the provisions of MARPOL through the Act to Prevent Pollution from Ships (APPS), 33 U.S.C. §§ 1901, *et seq.* APPS make it a crime for any person to knowingly violate the MARPOL Protocol, APPS, or regulations promulgated under APPS. *See* 33 U.S.C. § 1908(a).

Regulations for the prevention of pollution by oil from ships are set forth in Annex I to MARPOL. APPS also authorizes the Coast Guard to issue regulations implementing the requirements of these treaties. 33 U.S.C. §§ 1903, 1907. The Coast Guard utilized this authority in issuing detailed regulations. *See* 33 C.F.R. §§ 151.01, *et. seq.* Annex I sets out the standards for the maximum amount of oil permitted to be discharged from ships. *See United States v. Abrogar*, 459 F.3d 430, 431 (3rd Cir.2006). MARPOL also requires that ships have and maintain equipment to collect and measure the oil content of various waste and bilge discharges from ships and divert discharges which contain too much oil into storage tanks rather than discharging the liquid into the ocean. *Id.*

Vessels over a certain size (such as the *Pacific Ruby* ) must maintain an Oil Record Book. 33 C.F.R. § 151.25(a). The Oil Record Book must contain entries which relate to the (1) transfer of oil; (2) management and disposal of oily wastes generated on board the vessel, including any discharges of dirty ballast or cleaning water from fuel oil tanks; and (3) the disposal of oily residue such as sludge, as well as discharges of bilge waste that has accumulated in machinery spaces. MARPOL Annex I, Reg. 20(1); *Abrogar*, 459 F.3d at 432. The Oil Record Book must also contain a record of emergency, accidental, or other exceptional discharges and the circumstances or reasons therefore. 33 C.F.R. 151.25(g). Certain entries in the Oil Record Book must be signed by the person in charge of the operation. 33 C.F.R. 151.25(h). Finally, under Title 33, United States Code, Section 1908(a), a person who knowingly violates the MARPOL Protocol, that chapter, or the regulations issued thereunder, commits a class D felony.

### Law of the Flag

OSG argues that the Government cannot criminalize conduct that it cannot regulate directly. It argues that the "Law of the Flag," jurisdictional limitations within the APPS statute, and jurisdictional limitations of international law prohibit this prosecution.

The law of the flag is customary international law recognized by the courts of the United States and the world. *United States v. Royal Caribbean Cruises Ltd.*, 24 F.Supp.2d 155, 160 (D.P.R.1997). In *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), the Supreme Court stated:

> "Perhaps the most venerable and universal rule of maritime law ... is that which gives cardinal importance to the law of the flag ... This Court has said that the law of the flag supersedes the territorial principle, even for purposes of criminal jurisdiction of personnel of a merchant ship because ... [the ship] "is deemed to be a part of the territory of the sovereignty [whose flag it flies], and not to lose that character when in navigable waters within the territorial limits of another sovereignty."

*Lauritzen v. Larsen*, 345 U.S. at 584–85, 73 S.Ct. 921, 97 L.Ed. 1254(quoting *United States v. Flores*, 289 U.S. 137, 155–59, 53 S.Ct. 580, 77 L.Ed. 1086 (1933)).

Under international law, all nations have an equal right to travel on the high seas. *United States v. Marino–Garcia*, 679 F.2d 1373, 1380 (11th Cir.1982), *cert. denied* 459 U.S. 1114, 103 S.Ct. 748, 74 L.Ed.2d 967 (1983) (internal citations omitted). To insure the principle of freedom of the seas, international law generally prohibits any country from asserting jurisdiction over foreign vessels on the high seas. *Id.* The so-called flag-state rule is so pervasive that under some circumstances the flag state's jurisdiction extends

even into the territorial waters (12 mile limit) of another state. *See Benedict on Admiralty*, § 112a[4] (7th ed.2003) (citing *United States v. Flores*, 289 U.S. 137, 149–150, 53 S.Ct. 580, 582, 77 L.Ed. 1086 (1933). Thus, the flag state's jurisdiction should be allowed, as a matter of comity, to prevail over that of the territorial state, unless the peace and dignity of the country, or the tranquility of the port is threatened. *Id.* Citing *United States v. Rodgers*, 150 U.S. 249, 14 S.Ct. 109, 37 L.Ed. 1071 (1893); *United States v. Reagan*, 453 F.2d 165 (6th Cir.1971), *cert. denied*, 406 U.S. 946, 92 S.Ct. 2049, 32 L.Ed.2d 334 (1972).

However, a different result may occur if the criminal conduct occurs in port. It has been noted that the flag rule is derived from the territorial principle. *Id.* That a state may exercise jurisdiction with respect to all persons or things within its territory (the territorial principle) is a well-established principle of international law. *Benedict on Admiralty*, § 112a[3]. The Supreme Court first established the territorial principle in 1812 when Chief Justice Marshall declared that the jurisdiction of the nation within its own territory is necessarily exclusive and absolute. *See Schooner Exchange v. M'Faddon*, 7 Cranch 116, 11 U.S. 116, 136, 3 L.Ed. 287 (1812). The Supreme Court has also held that in the maritime context, when a merchant vessel enters the port of another, it subjects itself to the laws of that place unless by treaty or otherwise the two reach an alternate agreement. *Benedict, supra*, citing *Wildenhus' Case*, 120 U.S. 1, 7 S.Ct. 385, 30 L.Ed. 565 (1887) (the United States had jurisdiction over Belgian national who had killed countryman on board Belgian vessel moored at a New Jersey dock); *see also United States v. Diekelman*, 92 U.S. 520, 525, 23 L.Ed. 742 (1875) (according to the law of nations, "merchant vessels of one country visiting the ports of another ... subject themselves to the law which governs the port that they visit, so long as they remain").

The crimes set forth in the Second Superseding Indictment each allege that they occurred, at least in part, in various ports within the Eastern District of Texas. The Government has unfettered jurisdiction to prosecute violations of its national laws that occur within its borders. *See, e.g. Nevada v. Hall*, 440 U.S. 410, 416, 99 S.Ct. 1182, 59 L.Ed.2d 416; *see also United States v. Royal Caribbean Cruises Ltd.*, 11 F.Supp 2d 1358, 1373 (S.D.Fla.1998). Accordingly, the Law of the Flag does not bar the prosecution of OSG in this case.

### *Transfer under MARPOL*

OSG argues that, under Article 6(2) of MARPOL, the United States was required to report the record keeping violations to authorities in the flag state (the Marshall Islands) for appropriate action. Relatedly, OSG argues that Article 4(2) of MARPOL provides for the exercise of jurisdiction by the port state only if the matter is "within the jurisdiction" of that state.

Article 6(2) of MARPOL allows officials of the port state (in this case, officers of the United States Coast Guard), to inspect the *Pacific Ruby* for the purpose of verifying whether the ship has discharged any harmful substances in violation of the provisions of the Regulations. MARPOL, Article 6(2). "If an inspection indicates a violation of the Convention, a report shall be forwarded to the Administration for any appropriate action." *Id.* The "Administration" is the flag state. MARPOL, Article 2(5). Therefore, under Article 6(2), any such report made by the Coast Guard in this instance should have been forwarded to the Marshall Islands.

However, Article 4(2) of MARPOL further provides:

(2) Any violation of the requirements of the present Convention *within the juris-*

*diction of any party* to the Convention shall be prohibited and sanctions shall be established therefore under the law of that Party. Whenever such a violation occurs, that Party shall either:

 (a) cause proceedings to be taken in accordance with the law; *or*

 (b) furnish to the Administration of the ship such information and evidence as may be in its possession that a violation has occurred.

MARPOL, Article 4(2)(emphasis added).

A close reading of Article 4(2) this statute indicates that, if the United States has jurisdiction over this matter, it can choose to bring the appropriate charges, or it can refer the case to the flag state. In other words, Article 4(2) provides for concurrent jurisdiction between the port state and the flag state. This Court is not alone in its interpretation of Article 4(2) and UNCLOS, as two district courts have reached the same conclusion. *See United States v. Royal Caribbean Cruises, Ltd.,* 24 F.Supp.2d 155, 160 (D.P.R.1997) ("A careful review of the MARPOL and UNCLOS treaties reveal the concurrent jurisdiction of this matter between the United States and Norway."); *United States v. Royal Caribbean Cruises, Ltd.,* 11 F.Supp.2d 1358, 1367–68 (S.D.Fla.1998).

As stated above, the record keeping violations, as charged, were allegedly committed within the Eastern District of Texas at various ports. The United States has jurisdiction over offenses committed within its borders and has elected to assert that jurisdiction, rather than refer the matter to the flag state. This Court has no input in that decision.

### United Nations Convention on the Law of the Sea

OSG contends that the United Nations Convention on the Law of the Sea (UNCLOS) permits only civil penalties for violations under APPS and MARPOL committed by foreign flagged vessels, except for willful and serious acts of pollution committed in the territorial sea of the coastal state, citing Article 230, section 7. The Government answers that the United States is not a party to UNCLOS. The Government further argues that even if the United States were a party to UNCLOS, it does not constrain or limit a prosecution for crimes committed in port.[2] Finally, the Government contends that Article 230 does not apply to corporations.

Section 7 of part XII of the Law of the Sea Convention states:

> Monetary penalties only may be imposed with respect to violations of national laws and regulations or applicable international rules and standards for the prevention, reduction and control of pollution of the marine environment, committed by foreign vessels in territorial sea, except in the case of a willful and serious act of pollution in the territorial sea.

*Law of the Sea Convention,* Article 230.2. In resolving these issues, this Court once again looks to the analysis and reasoning set forth by the district courts in *United States v. Royal Caribbean Cruises, Ltd.,* 24 F.Supp.2d 155 (D.P.R.1997) and *United States v. Royal Caribbean Cruises, Ltd.,* 11 F.Supp.2d 1358 (S.D.Fla.1998).

Both district court cases involved Royal Caribbean Cruises, Ltd., (RCCL) as the corporate defendant. The Puerto Rico

---

**2.** The Government points out that each count of the Second Superseding Indictment alleges a crime which occurred within the Eastern District of Texas and contends that defendants have cited no authority for the proposition which supports dismissal for the alleged crimes of conspiracy, making false statements, or failing to maintain an Oil Record Book while in a United States port.

district court noted that although UNCLOS was currently pending ratification by the Senate, it nevertheless carried the weight of law from the date of its submission by the President to the Senate. 24 F.Supp.2d at 159 (Citing Article 19 of the Vienna Convention on the Law of Treaties). Finding UNCLOS to be applicable and finding no serious act of pollution, the district court held that the defendant could only be subjected to monetary penalties within the jurisdiction of the United States pursuant to Article 230.2. *Id.* at 160. However, the Puerto Rico district court denied RCCL's motion to dismiss, holding that the limitation of monetary penalties does not bar the United States from pursuing the charges in the indictment. *Id.* The district court held that "[a]lthough the Government may be estopped from seeking non-monetary penalties, such as imprisonment, the pursuit of monetary penalties in no way contravenes international law." *Id.*

The Miami RCCL court first addressed whether or not UNCLOS should be accorded the weight of law. 11 F.Supp.2d at 1370. The district court held that it was "not convinced that UNCLOS, a treaty which all parties agree applies to protect navigational freedoms and the law of the sea, has any bearing on this domestic prosecution. The alleged crime occurred in port in Miami, Florida and involved the presentation of a materially false writing to the United States Coast Guard." *Id.* The district court noted that the fact that international issues are implicated is not enough to divest the United States of jurisdiction and that the presentation of a false Oil Record Book seemed more appropriately characterized as a domestic law violation over which the United States properly has jurisdiction. *Id.* at 1371. The court further recognized that the gravamen of the action was not the pollution, not the Oil Record Book violation occurring at that time, but the misrepresenta-

tion made while in port. *Id.* As a result, the district court found that the proceeding was not properly characterized as "in respect to a pollution incident" so that UNCLOS, a convention addressing the law of the sea was applicable. *Id.*

The Miami court continued in its analysis, and assumed *agruendo,* that UNCLOS may be raised an a potential issue. *Id.* The court acknowledged that it did appear that UNCLOS is properly considered customary international law. *Id.* at 1372. The district court found no authority for the proposition that customary international law is properly self executing so as to afford RCCL standing to litigate its rights under UNCLOS. *Id.* However, the district court did not need to decide if UNCLOS was self-executing because it found no specific right of private action in UNCLOS that would provide an individual litigant redress under UNCLOS. *Id.* at 1373. Since there was no private right of action, RCCL did not have standing to litigate its rights under UNCLOS. *Id.* Accordingly, the Miami court denied RCCL's motion to dismiss on that ground. *Id.*

By its own terms, Article 230.2, if it does apply, does not prohibit prosecution. It only prohibits non-monetary sanctions. The Government may at some point in time be estopped from attempting to impose non-monetary penalties, but that is an issue to be addressed by the district court at a later date. Therefore, this Court finds that the charges in the Second Superseding Indictment should not be dismissed on this ground.

Additionally, this Court agrees with the analysis of the Miami district court. The crimes alleged in the Second Superseding Indictment allegedly occurred in the Eastern District of Texas. Like in the Miami case, the issue is not concerning a pollution incident or violation. Although it is al-

leged that pollution equipment was bypassed and discharges were made, OSG has not been charged with a pollution violation and none is alleged. The charges in this case evolve from Defendant's alleged misrepresentations and omissions contained in the ship's Oil Record Book when it was presented on various occasions in the Eastern District of Texas. It is difficult, at best, to categorize this prosecution as being "in respect to a pollution incident". This Court will follow the direction of Judge Middlebrooks in his Miami RCCL opinion and find that UNCLOS does not divest the Court of jurisdiction and is not applicable.

Although UNCLOS was signed by the United States in 1994 and sent to the United States Senate, it has not been ratified by the Senate and does not have the force of law. *United States v. Best,* 304 F.3d 308, 315 (3rd Cir.2002). In any event, even if the United States were a party to UNCLOS, and it did apply, OSG has no standing to assert rights under the treaty. Treaties are contracts between or among independent nations and, as such, do not create rights that are privately enforceable. *United States v. Jimenez–Nava,* 243 F.3d 192, 195 (5th Cir.2001), *cert. denied* 533 U.S. 962, 121 S.Ct. 2620, 150 L.Ed.2d 773 (2001).

Finally, this Court agrees with the Miami RCCL court that it does appear that UNCLOS is properly considered customary international law. *See also Mayaguezanos Por La Salud Y El Ambiente v. United States,* 198 F.3d 297, 304 n. 14 (1st Cir.1999). Even so, this Court also finds that OSG still does not have standing. A violation of international common law does not affect the Court's jurisdiction. *See United States v. Williams,* 617 F.2d 1063, 1090 (5th Cir.1980). In addition, there is no specific right of private action in UNCLOS which would provide the Defendant redress. *See Royal Caribbean Cruises, Ltd.* (Miami RCCL), 11 F.Supp.2d at 1373.

### Freedom of Navigation Argument

OSG points out that, during the negotiation of UNCLOS, the United States was concerned regarding the impact of coastal state exercises of jurisdiction which could impact freedom of navigation. OSG argues that, in seeking to prosecute OSG criminally for entering United States ports, the Government is in contravention of freedom of navigation. OSG argues that this freedom of passage or navigation is extremely important and that a coastal state cannot exercise jurisdiction on board a foreign ship passing through the territorial sea except if the crime extends to the coastal state or is a kind which destroys the peace of the country or the good order of the territorial sea.

As mentioned *supra,* any right to complain about a violation of the right of innocent passage belongs to the Marshall Islands, not OSG. OSG has cited no authority which indicates that, based upon principles of freedom of navigation, it is immune from charges such as these, which allegedly occurred in the Eastern District of Texas, or that it has a private right of action.

### Are only civil penalties available under APPS?

Title 33, United States Code, Section 1908(a) provides, in part:

(a) Criminal penalties; payment for information leading to conviction

A person who knowingly violates the MARPOL Protocol, Annex IV to the Antarctic Protocol, this chapter, or the regulations issued thereunder commits a class D felony.

Title 33, United States Code, Section 1908(b) also provides, in part:

I. Civil penalties; separate violations; assessment notice; considerations affecting amount; payment for information leading to assessment of penalty

A person who is found by the Secretary, after notice and an opportunity for a hearing, to have

(1) violated the MARPOL Protocol, Annex IV to the Antarctic Protocol, this chapter, or the regulations issued thereunder shall be liable to the United States for a civil penalty, not to exceed $25,000 for each violation; or

(2) made a false, fictitious, or fraudulent statement or representation in any matter in which a statement or representation is required to be made to the Secretary under the MARPOL Protocol, Annex IV to the Antarctic Protocol, this chapter, or the regulations thereunder, shall be liable to the United States for a civil penalty, not to exceed 5000 for each statement or representation.

Defendant argues that the criminal provision of APPS (33 U.S.C. § 1908(a)) fails to expressly criminalize the making of false statements and that false statements are expressly provided for in the civil section of APPS (33 U.S.C. § 1908(b)(2)). Defendant argues that false statements are not included among the acts subject to criminal sanctions under APPS.

The Government responds that the civil and criminal provisions of APPS can be read in harmony. According to the Government, Congress intended that the criminal sanctions of APPS be reserved for the worst types of violations—those committed knowingly. The Government notes that, in contrast, the civil penalty provisions, including the civil infraction for making a false statement, have no *mens rea* requirement and may be imposed without proof of intent. The Government concludes that the availability of the lesser penalties for a lesser offense in no way negates or repeals the availability of criminal; penalties when "knowing" conduct is at issue.

The starting point for interpreting a statute is an examination of the language of the statute itself. *United States v. Kay,* 359 F.3d 738, 742 (5th Cir.2004). When construing a criminal statute, we must follow the plain and unambiguous meaning of the statutory language. *Id.* A statute must, if possible, be construed in such a fashion that *every word* has operative effect. *Id.* (emphasis added). It is a cardinal principle of statutory construction that a statute ought to be construed so that no clause, sentence, or word shall be superfluous, void, or insignificant. *Kaltenbach v. Richards,* 464 F.3d 524, 528 (5th Cir.2006). When a statute's language is plain, the sole function of the courts, at least where the disposition required by the text is not absurd, is to enforce it according to its terms. *Carrieri v. Jobs.com, Inc.,* 393 F.3d 508, 518 (5th Cir.2004).

This Court finds that 33 U.S.C. § 1908(a) unambiguously provides for criminal penalties for knowing violations of the MARPOL Protocol and the corresponding regulations, while Section 1908(b) unambiguously provides for civil penalties which may not have been committed with the requisite intent. Congress' intentional placement of the word "knowingly" in § 1908(a) indicates its desire to apply harsher sanctions to those who knowingly violate pollution laws. Defendant's reading of the statute ignores Congress' requirement of *mens rea* before imposing criminal sanctions. Knowingly made false statements can properly be prosecuted under § 1908(a).

### *False Statements and Obstruction of Justice*

Title 18, United States Code § 1001 provides that "(a) ... whoever ... knowingly and willfully

(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

(2) makes any false, fictitious, or fraudulent statement or representation; or

(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry shall be fined under this title . . .

Count 2 of the Second Superseding Indictment alleges that Jho and OSG, on or about September 15, 2005, in Port Neches, Texas, in the Eastern District of Texas: "acting through its wholly-owned subsidiaries, agents and employees, who were acting within the scope of their agency and employment, and for the benefit of Defendant OSG, dis knowingly and willfully make and use and cause the making and use of materially false writings and documents, in a matter within the jurisdiction of the U.S. Coast Guard and Department of Homeland Security, to wit, during a U.S. Coast Guard inspection of the *Pacific Ruby* to determine the ship's compliance with United States law, Defendant Jho made and used a false and fictitious Oil Record Book that stated that a discharge had been made on September 11, 2005 "with 15 ppm equipped" and created the overall false and misleading impression, through materially false and misleading entries and omissions, that the vessel was being operated properly, when Defendant Jho knew then and there that the fifteen (15) ppm equipment, namely the Oil Content Meter, was being flushed with fresh water, and was not sensing a true sample of the oily mixture, slops from bilges and bilge water that had accumulated in machinery spaces that were being discharged overboard.

All in violation of Title 18, United States Code, sections 1001(a)(3) and (2)."

According to OSG, the Government does not allege that any illegal discharge occurred in United States territorial waters. OSG contends that the Government has exceeded the jurisdictional limits of APPS in that the actual entries into the log, "while the vessel was outside the territorial waters of the United States", was not within the purview of the United States Government's jurisdiction

Again, we look to the Miami district court's opinion in *United States v. Royal Caribbean Cruises, Ltd.*, for guidance on this issue. RCCL argued that since the Government had no authority to regulate conduct occurring outside the navigable waters of the United States, the Oil Record Book and its entries or lack thereof were not within the jurisdiction of the United States, much less the United States Coast Guard. *Id.* at 1362.

The Miami district court noted that the United States Supreme Court stated that jurisdiction within the meaning of section 1001 should not be narrowly or technically defined. *Id.* (Citing *United States v. Herring*, 916 F.2d 1543, 1547 (11th Cir.1990), *cert. denied* 500 U.S. 946, 111 S.Ct. 2248, 114 L.Ed.2d 488 (citing *United States v. Rodgers*, 466 U.S. 475, 480, 104 S.Ct. 1942, 1946, 80 L.Ed.2d 492 (1984)). "Under the law as developed in the Eleventh Circuit, the fact that the alleged statement in a § 1001 case was not within the jurisdictional bounds of the United States is not fatal to the claim." *Id.* (Citing *United States v. Cox*, 696 F.2d 1294 (11th Cir.1983)(upholding conviction for § 1001 violation where relevant documents were filled out in Guatemala). The Miami district court concluded that whether or not the United States has the authority to regulate the unauthorized discharge at the time it occurred did not bear on the court's inquiry as to whether the United States had jurisdiction to enforce its laws in an

American port regarding the commission of false statements made to a United States agency performing its proper duties. *Id.* at 1364.

In *Bryson v. United States*[3], the Supreme Court stated that the term "'jurisdiction' should not be given a narrow or technical meaning for purposes of § 1001." The Coast Guard is authorized to conduct inspections of vessels to determine compliance with MARPOL, APPS, and related regulations, and is specifically authorized to examine a vessel's Oil Record Book pursuant to 33 C.F.R. Sections 151.23(a)(3) & (c). These inspections are regularly conducted activities of the Coast Guard. Defendant has cited no authority which suggests that the United States has no jurisdiction over false statements made in port concerning discharges made at sea which may be beyond the United States' jurisdiction to regulate. This Court agrees that "[t]o find the contrary would raise serious questions about the government's ability to enforce, as a matter of domestic law, false statements made in connection with such matters as bank fraud, immigration, and visa cases, where the statements at issue were made outside of the United States, perhaps acceptable or in the alternative unnecessary under the appropriate foreign regulatory scheme, but nonetheless illegal under United States law." *Royal Caribbean Cruises, Ltd.*, 11 F.Supp.2d at 1364.

In addition, an alternate basis for jurisdiction exists. Jurisdiction of the United States embraces offenses which have an effect within its sovereign territory, even though the acts constituting the offense occurred outside of the United States. *United States v. Williams*, 617 F.2d 1063, 1076 (5th Cir.1980) (en banc). Presentation of a false Oil Record Book to Coast Guard officials conducting an inspection pursuant to United States' laws and regulations certainly has an effect within the sovereign territory. *Royal Caribbean Cruises, Ltd.*, 11 F.Supp.2d at 1364.

Secondly, OSG argues that the statements in the Oil Record Book could not have been material because the Coast Guard could not have been affected by any statement relating to activities on the high seas over which they did not have jurisdiction. As discussed above, this Court finds that whether the United States has the authority to regulate the unauthorized discharge at the time it occurred does not bear on the instant inquiry as to whether the United States has jurisdiction to enforce its laws in a United States port regarding the commission of false statements made to a United States agency performing its proper duties.

■■■ A material statement is one that has a natural tendency to influence, or one that is capable of affecting or influencing a government function. *United States v. Puente*, 982 F.2d 156, 159 (5th Cir.1993), *cert. denied* 508 U.S. 962, 113 S.Ct. 2934, 124 L.Ed.2d 684 (1993). Actual influence or reliance by a government agency is not required. *Id.* The statement may be material even if it is ignored or never read by the agency receiving the misstatement. *Id.* In determining whether an indictment sufficiently alleges materiality the Court looks to whether the statement or representation alleged to be false could conceivable have a tendency or capacity to influence or affect a government function; that is, whether it is potentially capable of being proved material by the government at trial. *United States v. McGough*, 510 F.2d 598, 602 (5th Cir.1975). If the facts alleged in the indictment warrant an inference that the false statement is material, the indictment if not fatally insufficient for

**3.** 396 U.S. 64, 70, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969).

its failure to allege materiality *haec verba.* *Id.*

The Coast Guard is specifically authorized to board a ship to determine whether the vessel has discharged any oil or oily mixtures on violation of MARPOL and the Coast Guard officers are entitled to inspect the Oil Record Book, Oil Content Meter, and other equipment on the vessel. *See* 33 C.F.R. § 151.23(a)(3) & (c). The alleged statements and omissions, in an Oil Record Book which the Coast Guard has the lawful authority to inspect, would have a natural tendency to influence, or be capable of affecting or influencing the Coast Guard's mission of investigating violations of MARPOL, APPS, and other federal regulations concerning pollution of the seas and waterways.

OSG notes that Regulation 9(4) of Annex I of MARPOL provides that the use of the pollution equipment does not apply to the discharge of mixtures which have an oil content below 15 ppm. It further argues that the Government does not allege that the discharges at issue contained more than 15 ppm oil and that, therefore, any statement about those discharges were not material. In its response, the Government contends that Jho made entries in the Oil Record Book that discharges were made "with" or "through" 15 ppm equipment when he knew the equipment was being "tricked" and was not in operation. The Government notes that without the use of the monitoring equipment, it is not known exactly how much oil pollution was discharged be the defendants.

Simply put, the regulations require that the oil pollution equipment be in operation. It is a material misrepresentation (at least one for a jury to consider) to falsely indicate that pollution equipment on an oil tanker is properly working when, in fact, it had been disabled. APPS and MARPOL are in place to ensure that ships properly monitor the discharge of oily mixtures which are discharged overboard. It would be a material misrepresentation if it were alleged that defendants discharged mixtures which contained oil over the 15 ppm level, knowing that it contained a greater amount. Certainly "tricking" the equipment and making notations that the equipment was in operation would be a material misrepresentation, again, at least for a jury to consider.

Lastly, OSG argues that no reasonable jury would find beyond a reasonable doubt that it had the specific intent to deceive officials of the Coast Guard or that they acted with the intent to impede, obstruct, or influence an investigation or proper administration of any matter when the log book was inspected on September 15, 2005. This Court cannot foresee what evidence will be presented by the Government to the jury regarding the issue of intent. On a motion to dismiss an indictment, the court is only to consider those objections which are capable of determination without the trial of the general issue; evidentiary or factual questions should not be determined at this stage. *See United States v. Knox,* 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969).

### Conclusion

Accordingly, based upon the reasoning set forth herein, the undersigned United States Magistrate recommends that the District Court deny *Defendant Overseas Shipholding Group, Inc's Motion to Dismiss Second Superseding Indictment* [Clerk's doc. # 59].

### Objections

Pursuant to 28 U.S.C. § 636(b)(1)(c), all parties are entitled to serve and file written objections to the report and recommendation of the magistrate judge within ten (10) days of receipt of this report. Failure to file specific, written objections

to the proposed findings of facts, conclusions of law and recommendations contained within this report within ten (10) days after service shall bar an aggrieved party from *de novo* review by the District Judge of the proposed findings, conclusions and recommendations, and from appellate review of factual findings and legal conclusions accepted by the District Court except on grounds of plain error. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Douglass v. United Serv. Auto. Ass'n.*, 79 F.3d 1415 (5th Cir.1996) (*en banc*); 28 U.S.C. § 636(b)(1). The constitutional safeguards afforded by Congress and the courts require that, when a party takes advantage of his right to object to a magistrate's findings or recommendation, a district judge must exercise its nondelegable authority by considering the actual evidence and not merely by reviewing and blindly adopting the magistrate's report and recommendation. *See Hernandez v. Estelle*, 711 F.2d 619, 620 (5th Cir.1983); *United States v. Elsoffer*, 644 F.2d 357, 359 (5th Cir.1981) (per curiam).

Nov. 13, 2006.